## CITY OF NOVI v CITY OF DETROIT

Docket No. 82769. Argued May 1, 1989 (Calendar No. 4). Decided
    September 26, 1989.

The City of Novi brought an action in the Oakland Circuit Court
    against the City of Detroit Water and Sewerage Department,
    challenging the rate-making method used by the City of Detroit
    in determining the water rates it charged Novi. The court,
    Francis X. O'Brien, J., following a bench trial, found that the
    method of computation used by the department, viz., setting
    rates on the basis of the entire geographic area of the City of
    Novi, rather than on the actual area served, was consistent
    with the utility basis of rate-making under MCL 123.141(2);
    MSA 5.2581(2). The court held that Novi had failed to satisfy
    its burden of proving that the method used by the defendant
    violated the statute. The Court of Appeals, MAHER and SULLI-
    VAN, JJ. (HOOD, P.J., concurring), reversed, holding that under
    the amended statute a strict standard of judicial review was
    imposed, and that when that standard was applied, the depart-
    ment had failed to comply with the statute in setting water
    rates for the City of Novi (Docket No. 96203). The City of
    Detroit appeals.

In an opinion by Justice ARCHER, joined by Chief Justice
    RILEY and Justices LEVIN, BRICKLEY, CAVANAGH, and BOYLE,
    the Supreme Court held:

In a dispute regarding the legality of municipal water rates
    established pursuant to MCL 123.141(2); MSA 5.2581(2), a court
    should determine whether the challenging party has satisfied
    its burden of proving that the rate-making method or the
    resulting rate does not reasonably reflect the actual cost of
    service as determined under the utility basis of rate-making. In
    this case, the City of Novi did not meet that burden.

1. The utility basis of rate-making is designed to produce
    estimates of revenue requirements for investor-owned utilities
    and for public utilities which provide service to customers
    outside their corporate limits, seeking to allocate to different

REFERENCES

Am Jur 2d, Public Utilities §§ 133 et seq.
See the Index to Annotations under Water Supply.

customers a just and reasonable share of the system's operating and capital costs. The fundamental purpose is to compensate the public utility with a reasonable rate of return for non-owner, nonresident customers, commensurate with the value of the facilities required to provide the service.

2. Rate-making is a legislative function that is better left to the discretion of the governmental body authorized to set rates. Historically, great deference is accorded legislatively authorized rate-making authorities when reviewing the validity of municipal water rates. The rate lawfully established by a municipal utility is assumed to be reasonable in the absence of a showing to the contrary or a showing of fraud or bad faith or that it is capricious, arbitrary, or unreasonable. The burden of proof is on the challenging party. In reviewing such cases, the concept of reasonableness is of fundamental importance.

3. In amending MCL 123.141(2); MSA 5.2581(2), the Legislature, in eliminating the artificial limits imposed previously, intended municipal water rates to more accurately reflect the actual cost of service. However, in light of the difficulties inherent in the rate-making process and the statutory and practical limitations on the scope of judicial review, use of the phrase "based on the actual cost of service as determined under the utility basis of rate-making" cannot be construed to mean that the rate is to be equal to the actual cost of service. The plaintiff has the burden of showing that a given rate or rate-making method does not reasonably reflect the actual cost of service. In this case, it cannot be said that the department's rate-making method, using the geographic center of Novi to compute the distance factor and using the average elevation of the entire geographic area of the City of Novi to compute the elevation factor is unreasonable. The City of Novi did not meet its burden of proving that the department's rate-making method, or the resulting rates charged, failed to comply with the utility basis of rate-making under the statute.

Reversed.

Justice GRIFFIN, dissenting, stated that the case should be remanded to the trial court for further proceedings to establish the amount of overcharge on the basis of the City of Detroit's failure to calculate the elevation factor using the service area required by the methodology stipulated by the parties.

A stipulation entered into by parties is an important procedural device for narrowing the issues at trial. It is a device that has no utility unless the facts stipulated are honored. If stipulations can be quickly dismissed as insignificant explanations, their efficacy as procedural tools will quickly dissipate. Given

the stipulation between the parties that the consultant's report constituted the chosen utility basis of rate-making, followed by evidence that the rates actually charged were calculated by applying an elevation factor inconsistent with that basis, the City of Novi met its burden of proving that the rate was not based on the actual cost of service as determined under the utility basis of rate-making.

166 Mich App 397; 420 NW2d 839 (1988) reversed.

PUBLIC UTILITIES — MUNICIPAL CORPORATIONS — WATER RATES — REASONABLENESS — BURDEN OF PROOF.

In a dispute regarding the legality of municipal water rates, a court should determine whether the challenging party has satisfied its burden of proving that the rate-making method or the resulting rate does not reasonably reflect the actual cost of service as determined under the utility basis of rate-making (MCL 123.141[2]; MSA 5.2581[2]).

*Fried & Levitt, P.C.* (by *David M. Fried* and *Dennis Watson*), for the plaintiff.

*Donald Pailen,* Corporation Counsel, and *Robert C. Walter,* Assistant Corporation Counsel, for the defendant.

ARCHER, J. We granted leave to appeal in this matter, limited to the issues (1) whether the standard for judicial review of municipal utility water rates has been changed by 1981 PA 89, codified at MCL 123.141(2); MSA 5.2581(2) and, if so, what is that standard of review; and (2) whether the rate set by the defendant was based on the actual cost of services provided pursuant to MCL 123.141(2); MSA 5.2581(2).[1]

We hold that, in a dispute regarding the legality of municipal water rates established pursuant to MCL 123.141(2); MSA 5.2581(2), a court should determine whether the plaintiff has satisfied its burden of proving that the rate-making method or the resulting rate does not reasonably reflect the

[1] 431 Mich 905 (1988).

actual cost of service as determined under the utility basis of rate-making. In the instant case, the plaintiff City of Novi did not meet its burden of proving that the rate-making method employed by the City of Detroit Department of Water and Sewerage did not comply with the utility basis of rate-making. Therefore, we reverse the judgment of the Court of Appeals and grant judgment in favor of the defendant City of Detroit.

### INTRODUCTION

This case arises out of a dispute over water rates charged to the City of Novi as a customer of the City of Detroit Water and Sewerage Department (DWSD).[2]

In 1964 the City of Detroit and the Village of Novi entered into a contract providing for the sale and delivery of water from Detroit to Novi. Under the agreement, it is the DWSD's responsibility to

[2] Const 1963, art 7, § 24 empowers cities and villages to own and operate water supply systems for the benefit of residents and nonresidents:

> Subject to this constitution, any city or village may acquire, own or operate, within or without its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.
> Any city or village may sell and deliver heat, power or light without its corporate limits in an amount not exceeding 25 percent of that furnished by it within the corporate limits, except as greater amounts may be permitted by law; may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as may be determined by the legislative body of the city or village; and may operate transportation lines outside the municipality within such limits as may be prescribed by law.

The DWSD serves the residents of the City of Detroit as well as those in over one hundred other communities. It operates five water filtration plants. This system is integrated; if one plant should go out of service it is possible to supply that plant's normal service area from the other plants.

deliver water at one or more delivery points at the rates of flow and pressures necessary to meet all reasonable requirements of Novi's customers.[3] The responsibility for distributing the water beyond the delivery points to specific customers lies with Novi.

Water rates charged to the City of Novi for water supplied by Detroit are governed by the following provision in the contract:

> 8. The Village (Novi) agrees to pay for all water supplied by the Board at such rates as the Board may establish from time to time, it being mutually understood that such rates shall always be reasonable in relation to the cost incurred by the Board for the supply of water.

At the time this contract was entered into, MCL 123.141; MSA 5.2581, the statute from which Detroit derived its authority to enter into contracts for the supply of water, provided that the water rate charged to Novi could not be less than the rate charged to retail customers within Detroit or more than double the rate charged to customers within Detroit.[4]

---

[3] The relevant portion of the agreement provides as follows:

> 4. It is the understanding of both parties that the Board will provide such water system facilities as may be necessary to meet the terms of this agreement, and with the further understanding that the Board's responsibility in this respect does not run beyond said point or points of delivery, hereinafter more specifically set forth, it being clearly understood that the responsibility for distributing water from said points of delivery to the consumers lies entirely in the Village.
> 5. The distribution of Detroit system water by the Village shall be limited to the area within the limits of the Village, provided that the Village may supply water to such specific customers or areas beyond its limits as from time to time may be mutually agreed upon by the Village and the Board.

[4] Prior to the amendment in 1981, MCL 123.141(1); MSA 5.2581(1) provided as follows:

In 1981 PA 89, the Legislature amended MCL 123.141; MSA 5.2581. The amendment removed the language that limited water rates to twice that charged to customers within Detroit. As amended, the section states in pertinent part:

> (1) A municipal corporation, referred to in this act as a corporation, authorized by law to sell water outside of its territorial limits, may contract for the sale of water with a city, village, township, or authority authorized to provide a water supply for its inhabitants.
>
> (2) *The price charged by the city to its customers shall be at a rate which is based on the actual cost of service as determined under the utility basis of rate-making.* [MCL 123.141; MSA 5.2581.] [5]

The "utility basis" of rate-making is a methodology that is designed to produce relatively accurate estimates of revenue requirements for investor-owned utilities and for publicly owned utilities providing service to customers outside their corporate limits. A utility-rate method also seeks to allocate to different customers a just and reason-

---

Municipal corporations having authority by law to sell water outside their territorial limits, hereinafter referred to as corporations, may contract for such sale with cities, villages or townships having authority to provide a water supply for their inhabitants, *but the price charged shall not be less than nor more than double that paid by consumers within their own territory.* The price charged may be more than double that paid by consumers within their own territory if the water is delivered to a city, village or township lying outside the county within which the corporations are situated, and lying more than 10 miles beyond the territorial limits of the corporations. Any price charged that is more than double shall bear a reasonable relationship to the service rendered. [1957 PA 53.]

[5] The concurring judge on the Court of Appeals panel questioned whether 1981 PA 89 actually applied to the facts of this case. *Novi v Detroit,* 166 Mich App 397, 404; 420 NW2d 839 (1988) (Hood, P.J., concurring). At oral argument before this Court, however, counsel for the City of Detroit clearly conceded that MCL 123.141; MSA 5.2581, as amended by 1981 PA 89, applied.

able share of the operating and capital costs of the system. The fundamental purpose of a "utility basis" method is to compensate the proprietary interest in a public utility with a reasonable rate of return from nonowner, nonresident customers, commensurate with the value of the facilities required to provide service to these customers.[6]

---

[6] *Plymouth v Detroit,* 423 Mich 106, 114-116; 377 NW2d 689 (1985). The Court adopted the following helpful background statement regarding the rate-making process:

"Rate-making procedures in Detroit have been similar historically to those of other cities, until recently having been carried out by department personnel according to their projections of demand and revenue needs, and without much reference to increasingly technical rate-making procedures employed in private enterprise utilities where considerations of owner investment and profit, and state regulations were involved. But the basic purposes of rate-making, (1) to provide enough revenue to meet costs, and (2) to structure rates to differing uses, are the same for both publicly and privately owned utilities. In the past 40 years, a host of economic, technological and demographic changes have complicated the accomplishment of both purposes, and minimized the differences between the rate-making procedures of publicly-owned and privately-owned utilities. It is not surprising, then, that both municipal utilities and their customers have utilized the services of engineering and financial consultants who have become expert in the art of utility rate-making.

\* \* \*

"As municipal utility operations have become more complex and have borrowed from the experiences of privately-owned utilities, the so-called 'utility method' of estimating revenue needs has evolved and is now the generally preferred method. It is different from the cash method in its handling of capital related expenditures; in place of annual estimates of cash flow therefor, which can vary widely from year to year, the utility method substitutes long term depreciation of, plus a return or profit on, the capital invested in the utility plant. This handling of capital related expenditures not only allows the amortization of such expenditures at a determinable annual rate over a period of time, but it also allows the recovery of initial capital investment from future customers, a particularly important consideration in an expanding system.

"When the total revenue needs of the utility have been thus estimated, the estimated non-operating revenues of the utility are deducted, to determine the amount of money to be raised by charges for utility service, i.e., the aggregate amount to be

There is no single formula or method which may be identified as the "utility basis" of rate-making. The two broad categories of methods most widely used are the "demand commodity method" and the "base-extra capacity method."[7]

In December 1980, the DWSD adopted a proposal for a new rate-making method developed by its utility-management consultant, Camp, Dresser & McKee. The parties stipulated at trial that this proposal utilized the base-extra capacity method to classify cost components according to the following basic cost categories:

A. *Base Costs* Those costs associated with furnishing water at average annual rates of use.

B. *Maximum day extra capacity costs* Those

---

raised from differing rates charged to different classes of service.

"The final, and most complicated, step in the rate-making process is the definition of different classes of user and the determination of the relative charges to be made therefor. While a variety of factors other than cost of service may be pertinent in determining rates for different classes of intra-city users, cost to the users is the framework around which the rate structure is constructed. For extra-city service, the cost thereof would seem to be the primary factor in rate determination. In practice, it does not appear that the city of Detroit has assigned any weight to any other factor in its extra-city rate determinations, although some contracts contain minimum quantity requirements.

"The allocation of the estimated costs of the system as a whole between intra- and extra-city users may be undertaken in various ways. The two methods most widely used are the Demand-Commodity Method and the Base-Extra Capacity Method, described in Defendant's Exhibit P, Water Rates, 2d Ed., A Manual of Water Supply Practices, American Water Works Association, 1972. Each method attempts to allocate to the different customers a share of the operating and capital costs of the system fairly reflecting the kind of use the customer makes of the system. Each method involves a two-stage process, first attempting to allocate costs into two categories of service-cost functions, and then allocating those costs between customers according to their respective responsibility for each of the functional costs."

[7] *Id.* at 116.

additional costs associated with meeting water demands on the day or days of maximum use.

C. *Peak hour extra capacity costs* Those additional costs associated with meeting demands during the peak hour of use.

D. *Customer costs* Those costs more closely correlated with total number of customers served than with the volume or rates of water use. This category also includes costs of facilities which are separable and assignable to individual customers, for example, individual meters and service connections.

E. *Distance costs* Those costs associated with conveying water over distances from DWSD treatment plants to serve governmental jurisdictions.

F. *Elevation costs* Those costs associated with pumping water to higher elevations from DWSD treatment plants to serve governmental jurisdictions.

The dispute herein is whether the DWSD uses the proper method of calculating the distance and elevation factors for the City of Novi. In its 1980 report, Camp, Dresser & McKee described the following method for computing these factors for the purpose of setting rates:

> 3.2.2.1. Distance and Elevation—The distance parameter is equal to the average of five straight line distances drawn between *a customer's single meter connection or geographic center* (where there is more than one meter connection) and each of the DWSD's five water treatment facilities. The elevation parameter is equal to the average of five differentials in elevation established between *a customer's single meter connection or average service area elevation* and the DWSD's five water treatment facilities. [Camp, Dresser & McKee, *Proposed Water Rates* (June, 1980), pp 3-4. Emphasis added.]

The parties further stipulated that since 1961,

the DWSD has computed the elevation factor for its suburban customers with multiple meter connections on the basis of the average values of the entire geographic area of the customer community. Similarly, because the City of Novi is served by four metered connections, the DWSD computes the Novi distance factor on the basis of the geographic center of Novi.

The City of Novi disputes this method of computation because only a portion of Novi is actually served by the DWSD.[8] This area consists of the eastern and southeastern areas of the city, which are closer to the DWSD treatment facilities and lower in average elevation than the City of Novi as a whole. It is undisputed that if the distance and elevation factors had been computed using only the eastern and southeastern portion of the city, Novi residents would enjoy lower water rates.[9]

The case was tried without a jury in Oakland Circuit Court in April, 1986. Each party called only one witness. Plaintiff's witness was a civil engineer who was qualified as an expert in design and construction of water systems. He was not an expert on utility rate-making. The defense witness, William Stannard, was qualified as an expert on the subject of water rate-making and water-system engineering. At trial, defendant's expert, Mr. Stannard, testified that the DWSD's method of allocating costs on the basis of distance and elevation factors was consistent with the "utility basis" of rate-making. He also testified that capital costs attributed

[8] In other words, the dispute is regarding computation of the price Novi pays per unit of water. It is uncontroverted that Novi is only charged for the water actually delivered, as measured by the four meters within its city limits.

[9] The aggregate amount was just under eighty thousand dollars for the entire area served in the 1983-84 rate year, the last year for which figures were available at the time of trial.

to unconnected areas of Novi had already been incurred by the DWSD and were therefore attributable to the entire geographic area of Novi. Mr. Stannard offered his opinion that under the utility basis of rate-making, the DWSD was permitted to calculate the cost of providing water services to Novi by taking into account the entire geographic area of that city.

In closing argument at trial, counsel for the City of Novi asserted that use of the phrase "service area" in § 3.2.2.1 of the Camp, Dresser & McKee report bound the City of Detroit to use the actual service area of the City of Novi to compute the distance and elevation factors because Detroit had stipulated that the report constituted its method of determining the actual cost of service under the utility basis of rate-making as required by MCL 123.141(2); MSA 5.2581(2).[10]

In response, the City of Detroit argued that the expert testimony of Mr. Stannard established that Detroit's rate-making methodology for computing the distance and elevation factors was permissible under the utility basis of rate-making. The city asserted that the use of the term "service area" in the Camp, Dresser & McKee report was a "semantic" error that belied Detroit's use, since 1961, of the average area elevation of the City of Novi for computation of its elevation factor. Detroit further argued that under its contract with the City of Novi, it was obligated to provide facilities to serve the entire City of Novi and that Detroit had provided adequate facilities for such service. Detroit urged the court to find that it was reasonable

[10] It must be noted that the Camp, Dresser & McKee report uses the term "service area" only with respect to the elevation factor. Neither party argued that this distinction made a difference in the outcome. We do not reach this question because our resolution of the issues herein makes it unnecessary.

to use the entire geographic area of the City of Novi in computing its water rates.

The trial court found in favor of the City of Detroit. The court specifically found that computation of the elevation and distance factors using either the actual area served or the entire geographic area and its geographic center, respectively, would be consistent with the utility basis of rate-making. On that basis, the court held that the City of Novi had failed to satisfy its burden of proving that the method used by the City of Detroit violated MCL 123.141(2); MSA 5.2581(2).

The Court of Appeals reversed, holding that § 2 imposed a strict standard of judicial review and that the DWSD had failed to comply with the statute when it used the entire geographic area of Novi rather than the actual area served.[11]

The City of Detroit appealed in this Court, challenging the Court of Appeals application of a new standard of review as well as the Court of Appeals conclusion that the DWSD's water rates were in violation of § 2. We granted leave to appeal.[12]

## ANALYSIS

### I

Prior to the instant case, there had been no opportunity for this Court or the Court of Appeals to interpret MCL 123.141; MSA 5.2581 as amended by 1981 PA 89. Accordingly, the first question presented is whether that amendment changed the standard for judicial review of municipal utility water rates.

Historically, this Court has accorded great deference to legislatively authorized rate-making au-

[11] 166 Mich App 403-404.
[12] 431 Mich 905 (1988).

thorities when reviewing the validity of municipal water rates. In *Detroit v Highland Park,* 326 Mich 78, 100-101; 39 NW2d 325 (1949), the Court espoused the principle that "[t]he rate lawfully established by [the municipal utility] is assumed to be reasonable in absence of a showing to the contrary or a showing of fraud or bad faith or that it is capricious, arbitrary or unreasonable, and the burden of proof is on the [challenging party] to show that the rate is unreasonable."

The standard of review and allocation of the burden of proof in municipal utility-rate cases set forth in *Detroit v Highland Park* were recently cited with approval in *Plymouth v Detroit,* 423 Mich 106, 133-134; 377 NW2d 689 (1985). In that case, the Court engaged in an extensive discussion of municipal utility rate-making and the means which courts have used to review those rates.[13] The Court reaffirmed that the concept of reasonableness is of fundamental importance in this process. *Id.*

The Court in *Plymouth v Detroit* also cited *Meridian Twp v East Lansing,* 342 Mich 734, 749; 71 NW2d 234 (1955), which stated:

> The word "reasonable" with respect to rates charged by utilities is a word of the most universal employment. It may be provided by ordinance, statute, or constitution that rates shall be "reasonable," or "fair and reasonable." Moreover, should the question of rate arise on a contract implied in law, the judicial requirement is that the rate to be paid shall be "reasonable." It may also be employed (as in the case at bar) in a contract. The determination of its meaning, in any case, is not subject to mathematical computation with scientific exactitude but depends upon a comprehensive examination of all factors involved, having in

[13] See n 6.

mind the objective sought to be attained in its use. Here it is related to the costs incurred by the city in the supply of water. [Citations omitted.]

*Plymouth* and *Meridian Twp* are distinguishable in some respects from the matter before us, in that both opinions evaluated rates on the basis of contractual provisions. Nonetheless, they both stand for the general principle that rate-making is a legislative function that is better left to the discretion of the governmental body authorized to set rates.[14]

In the instant case, however, the Court of Appeals held that the change in statutory language effected by 1981 PA 89 created a new standard of review for municipal water rates. The Court stated:

Under the current statutory scheme, it is enough for the challenging party to show that the water rates do not reflect the actual cost of providing the service. In so ruling, though, we do not mean to hold municipal corporations accountable for every penny charged to their water service customers. Because rate-making is not an exact science, mathematical precision cannot be required. However, as recognized in the argument for the House Bill 4029 [the precursor of 1981 PA 89], municipal corporations now have at their disposal a reliable method for apportioning costs. While perhaps not exact, that method must certainly provide greater precision and guidance to municipal corporations than formerly available. It makes little sense then to adhere to a standard of review which was developed at a time when calcu-

[14] Compare *Chocolay Twp v Marquette,* 138 Mich App 79; 358 NW2d 636 (1984), where the Court of Appeals rejected the defendant city's argument that courts must give adequate deference to the legislative rate-making prerogative of a city. In a peremptory order, this Court remanded the case to the Court of Appeals for consideration in light of *Plymouth, supra.* 424 Mich 875 (1986).

lating the actual cost of water was neither possible
nor required. [166 Mich App 397, 403; 420 NW2d
839 (1988).]

Thus, the Court of Appeals banished the concept
of reasonableness from the determination of
whether a particular rate or rate-making method
complies with the utility basis of rate-making. We
decline to take this step. We find the Court of
Appeals reasoning to be inconsistent with a har-
monization of the new statutory language with the
statutory and common-law bases for judicial defer-
ence in municipal utility-rate cases.

Michigan courts, as well as those in other juris-
dictions, have recognized the longstanding princi-
ple of presumptive reasonableness of municipal
utility rates. These courts have stressed a policy of
judicial noninterference where the Legislature has
authorized governmental bodies to set rates. As
this Court noted in *Plymouth, supra* at 128-129,
the Court in *Federal Power Comm v Hope Natural
Gas Co,* 320 US 591, 602; 64 S Ct 281; 88 L Ed 333
(1943) stated:

We held in *Federal Power Commission v Natu-
ral Gas Pipeline Co* [315 US 575; 62 S Ct 736; 86 L
Ed 1037 (1942)], that the Commission was not
bound to the use of any single formula or combina-
tion of formulae in determining rates. Its rate-
making function, moreover, involves the making of
"pragmatic adjustments." And when the Commis-
sion's order is challenged in the courts, the ques-
tion is whether that order "viewed in its entirety"
meets the requirements of the Act. Under the
statutory standard of "just and reasonable" it is
the result reached not the method employed which
is controlling. It is not theory but the impact of
the rate order which counts. If the total effect of
the rate order cannot be said to be unjust and
unreasonable, judicial inquiry under the Act is at

an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. [Citations omitted.]

See also *Hillis Homes, Inc v Public Utility Dist No 1,* 105 Wash 2d 288, 297-298; 714 P2d 1163 (1986); *Pompano Beach v Oltman,* 389 So 2d 283 (Fla App, 1980); *Shawnee Hills Mobile Homes, Inc v Rural Water Dist No 6,* 217 Kan 421; 537 P2d 210 (1975); *Water Works Bd of Birmingham v Barnes,* 448 So 2d 296 (Ala, 1983).

The Michigan Legislature's intention that courts refrain from strictly scrutinizing municipal utility rate-making is reflected in several statutory provisions. For example, municipal utilities are exempt from the Public Service Commission's power to regulate rate-making. MCL 460.6; MSA 22.13(6).[15] The rate-making authority of a municipal utility is expressly reserved to the legislative body given the power to set rates under the municipal charter. MCL 141.103(d); MSA 5.2733(d),[16] MCL 141.121;

---

[15] MCL 460.6; MSA 22.13(6) provides as follows:

The public service commission is vested with complete power and jurisdiction to regulate all public utilities in the state *except a municipally owned utility,* the owner of a renewable resource power production facility as provided in section 6d, and except as otherwise restricted by law.

[16] As used in this act:

(d) "Governing body" means for a county, the board of commissioners; for a city, the council, common council, commis-

MSA 5.2751.[17] When the Legislature enacted 1981 PA 89, it did not concomitantly amend any of these statutory provisions to provide for additional judicial or administrative review of the rate-making process.

Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making. The decision of the Court of Appeals, however, superimposes Michigan courts as ultimate rate-making authorities despite the absence of any express statutory language or legislative history that would support such a role in the rate-making process.

We acknowledge that the Legislature intended

sion, or other body having legislative powers; for a village, the council, common council, commission, board of trustees, or other body having legislative powers . . . . If the charter of a public corporation or applicable law provides that a separate board has general management over a public improvement, "governing body" means, with respect to that public improvement, the separate board, subject to review by the legislative body of the public corporation as the charter or law may provide. Unless the charter or law specifically provides otherwise, the separate board shall adopt the bond authorizing ordinance, but shall not pledge full faith and credit.

[17] MCL 141.121; MSA 5.2751 provides as follows:

Rates for services furnished by a public improvement shall be fixed precedent to the issuance of the bonds. The rates shall be sufficient to provide for the payment of the expenses of administration and operation and the expenses for the maintenance of the public improvement as may be necessary to preserve the public improvement in good repair and working order; to provide for the payment of the interest on and the principal of bonds payable from the public improvements, as and when the bonds become due and payable, and for the creation of any reserve for the bonds as required in the ordinance; and to provide for other expenditures and funds for the public improvement as the ordinance may require. The rates shall be fixed and revised by the governing body of the borrower so as to produce these amounts.

that municipal water rates more accurately reflect the actual cost of service when it eliminated the artificial limits imposed by the previous version of MCL 123.141; MSA 5.2581. However, the Legislature's use of the phrase "based on the actual cost of service as determined under the utility basis of rate-making" cannot be construed to mean "exactly equal to the actual cost of service," in light of the difficulties inherent in the rate-making process and the statutory and practical limitations on the scope of judicial review. The concept of reasonableness, as recognized by the courts of this state and other states in utility rate-making contexts, must remain operable, in order to provide a meaningful and manageable standard of review.[18]

B

The determination of "reasonableness" is generally considered by courts to be a question of fact. *Plymouth v Detroit, supra.* In that case, this Court quoted the Louisiana Supreme Court, which stated:

> "The ascertainment of a fair return in a given case is a matter incapable of exact mathematical demonstration. It is one of reasonable approximation having its basis in a proper consideration of all relevant facts."

\* \* \*

The question of what constitutes a reasonable return is one of fact rather than of law. It requires

---

[18] Given the limited factual record before us, we need not determine whether the amended version of § 2 allows courts to set aside a municipal water rate only upon a finding that it is "arbitrary and capricious," or that it is an "abuse of discretion." As explained in part II, plaintiff did not present any testimony or other evidence to rebut the expert testimony that the DWSD employed a method consistent with the utility basis of rate-making to compute water rates for the City of Novi, nor did plaintiff establish that the actual rate charged did not reasonably reflect the actual cost of service.

the application of an enlightened judgment to the multiplicity of variables disclosed by the evidence. [*United Gas Pipeline Co v Louisiana Public Service Comm,* 241 La 687, 704-705; 130 So 2d 652 (1961), quoting *Southern Bell Tel & Tel Co v Louisiana Public Service Comm,* 239 La 175, 225; 118 So 2d 372 (1960).]

In ignoring the body of common law employing the concept of reasonableness in utility rate-making, the Court of Appeals provides insufficient guidance to the bench and bar for determining whether a given rate or rate-making method complies with § 2, and alters the burden of proof between the parties in a rate dispute.

Although the Court of Appeals nominally leaves the burden of proof on the plaintiff, stating that "it is enough for the challenging party to show that the water rates do not reflect the actual cost of providing the service,"[19] the burden of proof is effectively shifted to the defendant to justify its rate or rate-making method because any given formula will employ approximations of the factors used to arrive at an approximation of the actual cost of service. This effective shift of the burden of proof is ill-advised in that it would lead to a plethora of needless litigation. See *Plymouth v Detroit, supra* at 133-134.

C

For these reasons, we hold that 1981 PA 89 did not render inoperable the concept of reasonableness in the process of judicial review of municipal utility water rates. The burden of proof remains on the plaintiff to show that a given rate or rate-making method does not reasonably reflect the actual cost of service as determined under the

[19] 166 Mich App 403.

utility basis of rate-making pursuant to MCL 123.141(2); MSA 5.2581(2).

## II

At trial, defendant DWSD's expert offered the only testimony regarding the requirements of the utility basis of rate-making. After review of the various factors involved in utility method rate-making, the expert testified that it was his opinion that the DWSD's method of calculating distance and elevation factors for the City of Novi complied with this standard. His testimony was never refuted by the plaintiff.

The trial judge based his ruling on the fact that there was unrebutted testimony that the City of Detroit complied with the standards of the utility basis of rate-making. In substituting its fact finding for that of the trial court, the Court of Appeals ignored the City of Novi's failure to offer any testimony or other evidence that the water rate for Novi was not determined under the utility basis of rate-making. The Court also misconstrued the expert testimony of Mr. Stannard. Although he testified, in response to a question from the trial judge, that *his* definition of the term "service area" would encompass only the actual area served, he also testified that the DWSD's rate model, as developed by Camp, Dresser & McKee, used the entire geographic area of Novi.[20]

---

[20] On cross-examination by counsel for the City of Novi, Mr. Stannard testified as follows:

> *Q.* Okay. I want you to take exhibit eight and point out to us in exhibit eight where it says the geographic area of a city should be put into the computer.
>
> *A.* I don't believe that that description is included in this text.
>
> *Q.* Then are you telling us that the person who put what was in there—in the computer, changed it?

We disagree with the dissenting opinion's characterization of the record when it states that "[t]he expert witnesses of both parties testified that 'service area' means the area actually receiving water." *Post*, p 439. In fact, the DWSD's utility rate-making expert testified that the rate model developed by Camp, Dresser & McKee used the average geographic area elevation for each community served, including Novi, for computing the elevation factor.[21] Although Novi's water system engineering expert testified that the actual area served in Novi consisted of the eastern portion of the city, he was not allowed to give his opinion regarding the Camp, Dresser & McKee rate model because he was not an expert on utility rate- making.[22]

Utilizing the standard of review set forth in the preceding section, therefore, it cannot be said that the DWSD's use of the geographic center of Novi to compute the distance factor and use of the average elevation of the entire geographic area of the City of Novi to compute the elevation factor is unreasonable.

---

*A.* All I can tell you is, that Camp, Dresser and McKee, when they developed the rates, used the geographic center—or excuse me, the entire geographic area of the City of Novi, for determining the distance and elevation factors.

*Q.* Sir, you don't know that from your personal knowledge, do you?

*A.* I know that from my review of the Camp, Dresser and McKee working papers and the actual computer rate model that was developed by Camp, Dresser and McKee and was utilized by the department in the development of these rates.

[21] See n 20.

[22] Although he was not qualified to give an opinion regarding utility rate-making, Novi's expert testified on cross-examination and on redirect examination that it would be reasonable for the DWSD to use the average geographic area elevation of the service area to compute the elevation factor for Novi. He was not asked, nor did he give his opinion whether the DWSD rate model, using the average geographic area elevation of each community served, complied with the utility basis of rate-making.

The contract between the City of Novi and the City of Detroit requires the DWSD to provide facilities capable of providing water to the entire City of Novi.[23] The City of Detroit's expert, Mr. William Stannard, testified that Detroit's water system has already incurred capital costs attributable to the entire geographic area of Novi. Thus, Detroit stands ready to fulfill its contractual obligation to be able to provide water to the entire geographic area of Novi as needed. Although the DWSD's costs attributable to the unconnected areas of Novi are arguably excess capacity, they may still be included in calculating the rate base. Courts have held that excess capacity is includable in the rate base where it is reasonably necessary to fulfill contractual obligations. *Iowa Planners Network v Iowa State Commerce Comm,* 373 NW2d 106, 111-112 (Iowa, 1985); *Pennsylvania Power & Light Co v Pennsylvania Public Utility Comm,* 101 Pa Commw 370; 516 A2d 426 (1986); *North Carolina ex rel Utilities Comm v Eddleman,* 320 NC 344; 358 SE2d 339 (1987). In the instant case, because the DWSD system is integrated, the facilities that are arguably excess capacity are constantly in use.

Justice GRIFFIN correctly concludes in his dissent that "[municipal utility water] rates are still assumed to be reasonable, and the burden of proof continues to be on the challenging party to show that they are unreasonable." *Post,* p 443. However, the dissent displays a fundamental misunderstanding of utility rate-making when it goes on to state:

> Given the stipulation between the parties that the CD & M report constituted the chosen utility basis of rate-making, followed by evidence that the rates actually charged were calculated by applying an elevation factor inconsistent with that basis, I

[23] See n 3.

would find that the City of Novi met its burden.
[*Post,* pp 444-445.]

In referring to the Camp, Dresser & McKee report
as the "chosen" utility basis of rate-making, the
dissent completely ignores the expert testimony
that Camp, Dresser & McKee used the average
geographic area elevation of the City of Novi to
compute the elevation factor, consistent with
DWSD's longstanding practice. Further, the DWSD's
rate-making expert testified explicitly and without
rebuttal that the rate model employed was consis-
tent with the utility basis of rate-making. Accord-
ingly, the trial judge correctly concluded that the
City of Novi had not met its burden of proof.

The City of Novi argued, and the Court of Ap-
peals held, that the City of Detroit had conceded
the merits of the issues herein when it stipulated
that the Camp, Dresser & McKee method for
computing distance and elevation represented a
utility-basis methodology. We disagree. The dissent
correctly points out that the parties stipulated
that the DWSD's rate model was based upon a
methodology "outlined" in the Camp, Dresser &
McKee report. See *post,* p 439. The dissent, in
effect, argues that since the stipulation of facts
included the term "service area," Detroit conceded
that, in the CD & M model, the elevation parameter
was calculated using the area actually served and
not the entire geographic area. The stipulation on
its own terms is not clear. This is readily apparent
for several reasons. First, the statement of issues
to be tried, signed by both parties the day before
trial, states the sole issue to be determined as:

Does the City of Detroit's computation of dis-
tance and elevation cost of service factors using
the *entire geographic area* of the City of Novi

comply with the utility basis of ratemaking which
is required by MCL 123.141? [Emphasis added.]

To accept the dissent's argument would require us
to ignore the ultimate issue of the case as agreed
to by both parties. Furthermore, Novi expressly
conceded in the same document that Detroit "com-
put[es] distance and elevation using the entire
geographic area . . . ."

Second, both experts testified that they person-
ally would define "service area" to mean the area
actually served.[24] Only Detroit's expert, however,
testified that in the CD & M model, the only rate-
making model at issue in this case, the elevation
parameter was calculated on the basis of the en-
tire geographic area of Novi.[25] The trial court
specifically found that Novi failed to rebut this
testimony.

Finally, the trial court found as a conclusion of
fact that the CD & M model used the entire geo-
graphic area and not the actual area served. As
the trial court noted, the ultimate issue in this
case was whether the rate actually used violated
MCL 123.141(2); MSA 5.2581(2), not whether the
rate was calculated using the area actually served
or the entire geographic area.

Rather than "completely dismissing the stipula-
tion," we have merely interpreted it in light of the
facts and issues as agreed to by the parties and as
found by the trial court. The stipulation was de-
signed to narrow the issues and facts to be proven
at trial. It did not control the determination of
whether the method employed by the DWSD ren-
ders a rate that is reasonably based upon the
actual cost of service. The stipulation merely ex-
plained several facts regarding the utility basis of

[24] *Post,* p 439 (GRIFFIN, J., dissenting).
[25] See text accompanying n 20.

rate-making, the origin of the DWSD's rate-making method, and the cost factors considered in this particular method so that the trial court could decide the ultimate issue, viz., whether it was a violation of § 2 for the City of Detroit to compute the distance and elevation factors for the City of Novi on the basis of its geographic center and its entire geographic area, respectively.

### CONCLUSION

We hold that the plaintiff City of Novi did not meet its burden of proving that the City of Detroit Water and Sewerage Department's rate-making method, or the resulting rates charged, did not comply with the utility basis of rate-making. Therefore, we reverse the judgment of the Court of Appeals and grant judgment in favor of the City of Detroit.

RILEY, C.J., and LEVIN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred with ARCHER, J.

GRIFFIN, J. I respectfully dissent.

The majority barely mentions, and then dismisses the effect of, a "Stipulation of Facts" entered into at trial by the parties. As the Court of Appeals emphasized, "That stipulation, which was received and approved by the court, was binding upon the parties." 166 Mich App 397, 404; 420 NW2d 839 (1988).

As a result, the City of Detroit stipulated that the particular utility basis of rate-making specified in the 1980 Camp, Dresser & McKee (CD & M) report was used by Detroit in setting the rates for water sold to the City of Novi. Paragraph 8 of the stipulation by the parties provides:

The water rates charged by DWSD are based upon a methodology developed by consultant Camp, Dresser & McKee. The rate methodology is outlined in a June, 1980, report from Camp, Dresser & McKee, entitled "Proposed Water Rates."

According to the stipulation, ¶ 12, distance and elevation factors were to be computed under the CD & M methodology on the following basis:

"3.2.2.1. Distance and Elevation—The distance parameter is equal to the average of five straight line distances drawn between a customer's single meter connection or geographic center (where there is more than one meter connection) and each of the DWSD's five water treatment facilities. The elevation parameter is equal to the average of five differentials in elevation established between a customer's single meter connection or average *service area* elevation and the DWSD's[1] five water treatment facilities." [Emphasis added.]

The meaning of the term "service area," both generally and as applied to the City of Novi, was a central question at trial. The expert witnesses of both parties testified that "service area" means the area actually receiving water.[2]

---

[1] The initials "DWSD" stand for Detroit Water and Sewerage Department.

[2] At the close of Novi's expert's testimony, in response to the City of Detroit's motion for a directed verdict, the trial judge observed, "The only testimony I have that's unrefuted and uncontradicted in any regard, is that the service area is the area that's being served on the eastern side and not on the western side." Subsequently, during the cross-examination of Detroit's expert witness, the trial judge intervened and elicited the following:

*The Court:* What is the definition, in your opinion, of the service area, as it relates to Novi?

*A.* Novi—the area being served in Novi is the area to the right of that red line that's shown on that map.

* * *

*The Court:* I didn't ask you what was being served in Novi. I said the term—listen to me and look at me. The term service area as it relates to Novi, what area does it cover, does it meet?

Nevertheless, the majority completely dismisses the stipulation by acquiescing in the City of Detroit's assertion that "[t]he stipulation merely explained several facts regarding the utility basis of rate-making, the origin of the DWSD's rate-making method, and the cost factors considered in this particular method so that the trial court could decide the ultimate issue . . . ." *Ante,* pp 437-438. Accordingly, the majority reads the term "service area" in the stipulation to mean "entire geographic area" in order to conform the term to the very practice challenged by the City of Novi. Explaining away the significance of "service area" in this manner effectuates a retroactive amendment that renders the stipulation meaningless.

A stipulation entered into by the parties is an

> *A.* That's their current service area.
> *The Court:* So that's the service area. The term service area, as it relates to Novi, means that portion on the eastern part of the map that is presently being served. And that's the definition of service area.
> *A.* That would be my definition.
> *The Court:* Okay, and is that the definition that's used in the Detroit's [sic] rate making of—when it uses the term service area?
> *A.* They don't use the definition service area.
> *The Court:* . . . So you, in effect, are defining the term service area the same as him [sic, presumably, Novi's expert], the area that's being served?
> *A.* Yes, sir.

Counsel for the City of Novi then asked:

> *Q.* [A]pplying that formula, then you would use the average elevation to the east of that red line; would you not, sir?
> *A.* That is not what is done in the rate model methodology.

The trial judge again intervened:

> *The Court:* But he's asking you about that document [stipulation, ¶ 12] that says—using the service area, based on [sic] your definition, would it not mean just working with the east part.
> *A.* If we used this paragraph literally, then we would use the right side of the area.

important procedural device for narrowing the issues at trial. It is a device that has no utility unless the facts stipulated are honored. If stipulations can be quickly dismissed as insignificant explanations, their efficacy as procedural tools will quickly dissipate. The majority's treatment of the stipulation in this case does not square with past pronouncements by our Court on the integrity of stipulations:

> [O]nce stipulations have been received and approved they are sacrosanct. . . . A party must be able to rest secure on the premise that the stipulated facts and stipulated ultimate conclusionary facts as accepted will be those upon which adjudication is based. Any deviation therefrom results in a denial of due process for the obvious reason that both parties by accepting the stipulation have been foreclosed from making any testimonial or other evidentiary record. [*Dana Corp v Employment Security Comm,* 371 Mich 107, 110; 123 NW2d 277 (1963).]

Nor should the Court be satisfied with the excuse that the stipulation is a " 'semantic' error" at odds with the DWSD's actual practice. *Ante,* p 424. The City of Detroit has not alleged any of the factors that would allow us to "undo" its stipulation on the basis of error: there has been no showing that Detroit was misled into making the stipulation, nor was documentary evidence produced to demonstrate that the stipulation was in fact in error. *Kittridge v Toledo, A A & G T R Co,* 53 Mich 354; 19 NW 32 (1884). *Thompson v Continental Motors Corp,* 320 Mich 219; 30 NW2d 844 (1948). This "semantic error" is at the heart of the dispute before us: whether Detroit's computation of rates for service to the City of Novi complied with the statute. Once Detroit stipulated that the

CD & M methodology described in the stipulation was its methodology for purposes of this trial, there were only two questions left to be resolved:

> 1) Did the stipulated methodology satisfy the statute by reflecting the actual cost of service?
> 2) Did DWSD apply the formula properly to its service to the City of Novi?

The expert witnesses for Detroit and Novi both agreed at trial that the stipulated method satisfied the statute.[3] The unrefuted testimony further established that the formula actually applied by the City of Detroit did not conform to the stipulation because the elevation factor was calculated using the entire geographic area rather than the service area as described in the stipulation. The majority's reliance on the testimony of Detroit's expert witness that the CD & M methodology did *not* actually use the service area for determining the elevation factor is misplaced; because that testimony refuted a stipulated fact, it should have been disregarded. "Any deviation [from a stipulation of facts] results in a denial of due process for the obvious reason that both parties by accepting the stipulation are foreclosed from making any testimonial or other evidentiary record." *Dana Corp v Employment Security Comm, supra* at 110.

The implication by the majority that it is somehow unfair or contrary to the intent of 1981 PA 89 to hold the City of Detroit accountable to the stipulated CD & M methodology is simply untenable. The legislative history of 1981 PA 89 reveals that the City of Detroit specifically advanced the newly developed CD & M methodology as the pri-

---

[3] Given the stipulation, it was unnecessary for the City of Novi to refute the testimony of Detroit's expert witness that DWSD's actual practice, as opposed to the stipulated CD & M methodology, conformed to the statute. The stipulation made this testimony irrelevant.

mary justification for changing from a floor/ceiling limitation on rate-making to a cost-of-service, utility-basis model. The Senate Analysis Section analysis of the bill which became 1981 PA 89[4] was distributed to the Legislature prior to the final vote on the bill and offered the following rationale for amending the enabling act, 1917 PA 34:

> Part of the difficulty in setting fair rates arises from the tremendous complexity of assigning proportional responsibility for such a huge, intricate, and interconnected system [the DWSD], but the difficulty also arises in part from the limitations placed on rate-making by Public Act 34. Detroit officials believe that the first difficulty has been largely overcome by a study performed by the Boston consulting firm of Camp, Dresser, and McKee (CDM) and the development of a computer program from that study which serves to identify the actual cost of providing water to each community. [Senate Analysis Section, HB 4029, First Analysis, April 27, 1981, p 1.]

The City of Detroit has used the question of the proper standard of review of rates as a smoke screen to obscure the effect of the stipulation it agreed to prior to trial. To find in favor of the City of Novi in this case, it is not necessary to determine that the standard of review was significantly changed by the enactment of 1981 PA 89: rates are still assumed to be reasonable, and the burden of proof continues to be on the challenging party to show that they are unreasonable. *Detroit v Highland Park,* 326 Mich 78, 100-101; 39 NW2d 325 (1949). *Plymouth v Detroit,* 423 Mich 106, 133-134; 377 NW2d 689 (1985). The fact that the standard of review was not changed by 1981 PA 89, how-

---

[4] HB 4029. The Senate Analysis Section analysis dated April 27, 1981 analyzed the version of the bill that was enacted and signed into law.

ever, does not save the City of Detroit from its own stipulation.

What *was* changed by 1981 PA 89 was the *basis* for determining whether a rate is unreasonable. Thus it did not "render inoperable the concept of reasonableness in the process of judicial review" (*ante,* p 432); rather, it clarified the concept. Prior to enactment of 1981 PA 89, a party challenging rates that fell within the limits of MCL 123.141(2); MSA 5.2581(2) had the burden of proving that the challenged rate did not bear a reasonable relationship to the service rendered.[5] 1957 PA 53 (repealed by 1981 PA 89). Now, the burden of the challenging party is more focused: it must prove that the rate is *not* "based on the actual cost of service as determined under the utility basis of rate-making."[6]

Given the stipulation between the parties that the CD & M report constituted the chosen utility basis of rate-making, followed by evidence that the

[5] The price charged may be more than double that paid by consumers *within their own territory if the water is delivered* to a city, village or township lying outside the county within which the corporations are situated, and lying more than 10 miles beyond the territorial limits of the corporations. *Any price charged that is more than double shall bear a reasonable relationship to the service rendered.* [1957 PA 53. Emphasis supplied.]

[6] I agree with the majority that courts of law generally are "ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making." *Ante,* p 430. 1981 PA 89 simplifies judicial review of rates established pursuant to its authority in two ways: 1) by establishing a more specific measure of reasonableness—(actual cost of service instead of cost bearing a "reasonable relationship to the service rendered"), and 2) specifying the method to be used to determine actual cost. Given the precise guidance provided by 1981 PA 89, I find it hard to share the majority's concern that courts may become ultimate rate-making authorities. *Ante,* p 430. In the instant case, the court's task was simplified even further by the fact that the parties had stipulated to the rate-making methodology to be examined at trial.

rates actually charged were calculated by applying an elevation factor inconsistent with that basis, I would find that the City of Novi met its burden.

The majority is correct, however, that the CD & M methodology, as stipulated by the parties, uses "service area" only in the calculation of *elevation*. While that distinction does not affect my conclusion that the City of Novi has demonstrated that the rates charged by the City of Detroit for the years in dispute were not in compliance with MCL 123.141(2); MSA 5.2581(2),[7] the distinction does affect the amount of the overcharge. Consequently, I would remand to the trial court for further testimony aimed at establishing the overcharge on the basis of the failure to calculate the elevation factor using the "service area" as required by the methodology stipulated by the parties.

[7] The City of Detroit calculated the *elevation factor* using the entire geographic area of Novi rather than only the area served, as provided in the stipulation.