JACKSON COUNTY v CITY OF JACKSON

JACKSON COFFEE COMPANY v CITY OF JACKSON

Docket Nos. 307685 and 307843. Submitted June 27, 2013, at Lansing.
Decided August 1, 2013, at 9:05 a.m.

Jackson County brought an original action in the Court of Appeals
against the city of Jackson, alleging that the city violated provi-
sions of the Headlee Amendment, Const 1963, art 9, §§ 25-34,
when it adopted an ordinance, Ordinance No. 2011.02, that
created a storm water utility and imposed under the ordinance a
storm water management charge on all property owners within
the city to generate revenue to pay for the services provided by the
storm water utility. The county alleged that the storm water
management charge was actually a tax levied without voter
approval in violation of § 31 of the Headlee Amendment, Const
1963, art 9, § 31. The county sought declaratory, injunctive, and
monetary relief. (Docket No. 307685.)

Jackson Coffee Company and Klein Brothers, LLC, also
brought an original action in the Court of Appeals against the city
of Jackson, alleging essentially the same facts and seeking the
same relief. (Docket No. 307843.) The Court of Appeals consoli-
dated the actions.

The Court of Appeals *held*:

1. A charge that is a user fee is not affected by the Headlee
Amendment. There is no bright-line test to distinguish a valid user
fee from a tax that violates the Headlee Amendment. However,
generally, a fee is exchanged for a service rendered or a benefit
conferred and some reasonable relationship exists between the
amount of the fee and the value of the service or benefit. The three
primary criteria of a fee are that it serves a regulatory purpose, it
is proportionate to the necessary costs of the service, and it is
voluntary. A tax, however, is designed to raise revenue.

2. The storm water management charge imposed in this case
serves the dual purposes of furthering a regulatory purpose and
raising revenue. The management charge has an overriding
revenue-generating purpose that outweighs the minimal regula-
tory purpose of the charge. The storm water management charge
is a tax, not a utility user fee.

3. A true fee confers a benefit on the particular person on whom it is imposed, whereas a tax confers a benefit on the general public. Although a regulatory fee may confer a benefit on both the general public and the particular individuals who pay the fee and still maintain its regulatory character, a charge is not a regulatory fee in the first instance unless it is designed to confer a particularized benefit on the property owners who pay the charge. In these cases, the Court of Appeals could not identify any particularized benefit the charge confers on the property owners that is not also conferred on the general public. The lack of a correspondence between the management charge and a particularized benefit conferred to the parcels supports a conclusion that the charge is a tax.

4. A fee need not generate an amount equal to that required to support the services the ordinance regulates in order to survive scrutiny. However, where the revenue generated by a regulatory fee exceeds the cost of regulation, the fee is actually a tax in disguise. A permissible utility service charge is one that reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component.

5. The method used by the city to apportion the management charges among all urban properties emphasizes administrative convenience and ease of measurement and suggests an absence of a close proportional relationship between the amount of runoff attributable to a particular parcel and the management charge, as does the fact that the method fails to consider property characteristics relevant to runoff generation.

6. Capital reserves of public utilities are properly funded by true user fees closely calibrated to the actual use of the service or the price paid for a commodity. The management charge at issue in these cases is not a true user fee. The actual use of the storm water sewer system by each parcel is not accounted for with the requisite level of precision necessary to support a conclusion that the charge is proportionate to the costs of the services provided.

7. The ordinance is effectively compulsory. This lack of volition supports the conclusion that the management charge is a tax imposed in violation of § 31 of the Headlee Amendment.

A declaratory judgment entered in favor of plaintiffs; city ordered to cease collecting the charge and ordered to reimburse only plaintiffs for any charges paid to date.

1. TAXATION — HEADLEE AMENDMENT — CONSTITUTIONAL LAW.

Section 31 of the Headlee Amendment prohibits units of local

government from levying any new tax or increasing any existing tax above authorized rates without the approval of the electorate (Const 1963, art 9, § 31).

2. TAXATION — FEES — MUNICIPAL CORPORATIONS.

The three primary criteria of a fee are that it serves a regulatory purpose, is proportionate to the necessary costs of the service, and is voluntary; a tax is primarily designed to raise revenue; a true fee confers a benefit on the particular person on whom it is imposed, while a tax confers a benefit on the general public; although a regulatory fee may confer a benefit on both the general public and the particular individuals who pay the fee and still maintain its regulatory function, a charge is not a regulatory fee in the first instance unless it is designed to confer a particularized benefit on the individuals who must pay the charge.

3. TAXATION — FEES — MUNICIPAL CORPORATIONS.

Fees charged by a municipality for providing a service must be reasonably proportionate to the direct and indirect costs of providing the service; the fees need not generate the exact amount required to support the service provided, however, when the revenue generated by a fee exceeds the costs of providing the service, the fee may be a tax in disguise.

4. MUNICIPAL CORPORATIONS — UTILITY SERVICES CHARGES — USER FEES — CAPITAL RESERVES.

A permissible utility service charge is one that reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component; capital reserves of public utilities are properly funded by true user fees closely calibrated to the actual use of the service or the price paid for a commodity.

*Cohl, Stoker & Toskey, PC* (by *Timothy M. Perrone*), for Jackson County.

*Brian W. Surgener* for the Jackson Coffee Company and Klein Brothers, LLC.

*Julius A. Giglio*, City Attorney, *Bethany M. Smith*, Deputy City Attorney, and *Miller Canfield Paddock and Stone, PLC* (by *Michael P. McGee, Sonal Hope Mithani,* and *Jeffrey S. Aronoff*), for the city of Jackson.

Before: MURPHY, C.J., and HOEKSTRA and OWENS, JJ.

PER CURIAM. Plaintiffs commenced these original actions in the Court of Appeals under Const 1963, art 9, §§ 25-34, popularly known as the Headlee Amendment. The actions were consolidated by the Court of Appeals. The Jackson City Council adopted Ordinance No. 2011.02, pursuant to which the city created a storm water utility and imposed a storm water management charge on all property owners within the city to generate revenue to pay for the services provided by the utility, which include, among others, street sweeping, catch basin cleaning, and leaf pickup and mulching. The question posed by these actions is whether the city, by shifting the method of funding certain preexisting government activities from tax revenues to a utility charge, ran afoul of § 31 of the Headlee Amendment, Const 1963, art 9, § 31,[1] as construed and applied in *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998). We answer this question in the affirmative and hold that the city's storm water management charge is a tax, the imposition of which violates the Headlee Amendment because the city did not submit Ordinance 2011.02 to a vote of the qualified electors of the city. The charge is null and void.

---

[1] Although plaintiffs allege a violation of § 25, Const 1963, art 9, § 25, their enforcement actions implicate only § 31. See, e.g., *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998). Section 25 of the Headlee Amendment summarizes the "fairly complex system of revenue and tax limits" imposed by the amendment, *Durant v Michigan*, 456 Mich 175, 182; 566 NW2d 272 (1997), and is implemented through the other sections of the amendment, Const 1963, art 9, § 25. Additionally, we decline to address plaintiffs' claims that the imposition of the management charge violates Const 1963, art 4, § 32 and Const 1963, art 9, § 6 because these claims are outside the scope of our original jurisdiction conferred by § 32 of the Headlee Amendment, Const 1963, art 9, § 32.

I

The city maintains and operates separate storm water and waste water management systems. Various state permits authorize the city to discharge storm water through its separate storm water drainage system to the Grand River, as well as other waters of the state. Historically, the city has funded the operation and maintenance of its storm water management system with money from the city's general and street funds. The money in these funds is generated through the collection of ad valorem property taxes, gasoline taxes, and vehicle registration fees. With revenue from these taxes and fees in decline, the city retained an engineering and consulting firm to study the feasibility of establishing a storm water utility for the purpose of funding storm water management through dedicated "user fees." As acknowledged by the city in its Stormwater Management Manual,

[w]hen subdivisions, roads and commercial developments are built or improved in the City of Jackson the City must pay for managing the resulting storm runoff. The City must install catch basins to capture storm water and storm sewers to convey the storm water to streams or rivers, ensuring it does not drain into the sanitary wastewater system and create sewer overflows. Furthermore the City must maintain the entire storm water collection system. In the past the City performed this work without a dedicated revenue source. The City used money from the general fund or the road budget, thus taking funds away from other critical programs. The storm water system is an expensive piece of the City's municipal infrastructure. The City's water and sanitary wastewater systems each have their own dedicated revenue sources derived from water and sanitary wastewater user fees. Water and sanitary wastewater users pay user fees that are partially calculated based on water consumption. However, this has not been the case with storm water management, which has had no

user fees attached to it. Municipalities across the country are changing this. They now view their storm water systems as utilities similar to their water and sanitary wastewater systems. They are developing storm water user fee structures to pay for storm water planning, administration, construction and operation and maintenance.

Following the completion of the feasibility study, the city's Department of Public Works requested that the city create a storm water utility "to fund the activities currently included in the General Fund Drains at Large, Leaf Pickup, Mulching, Street Cleaning and Catch Basin Maintenance in the Major and Local Street accounts." The Jackson City Council adopted Ordinance 2011.02, known as the "Storm Water Utility Ordinance," at its January 11, 2011, meeting.

Ordinance 2011.02 establishes a storm water utility to operate and maintain the city's storm water management program. The ordinance funds this program through an annual storm water system management charge imposed on each parcel of real property, including undeveloped parcels, located within the city. All revenues generated by the storm water management charge are deposited in a storm water enterprise fund and "[n]o part of the funds . . . may be transferred to the general operating fund or used for any purpose other than undertaking the storm water management program, and operating and maintaining a storm water system." More specifically, the money in the enterprise fund may be used only to pay the "costs to acquire, construct, finance, operate and maintain a storm water system."

The management charge is computed using a formula developed by the engineering consultant that roughly estimates the amount of storm water runoff of each parcel. Anticipated storm water runoff is computed in terms of equivalent hydraulic area (EHA). This

method of computation involves an estimation of the amount of storm water leaving each parcel of property based on the impervious and pervious surface areas of each parcel. The ordinance defines the phrase "impervious area or surface" as "a surface area which is compacted or covered with material that is resistant to or impedes permeation by water, including but not limited to, most conventionally surfaced streets, roofs, sidewalks, patios, driveways, parking lots, and any other oiled, graveled, graded, or compacted surfaces." "[P]ervious area or surface" is "all land area that is not impervious."

The EHA base unit used to compute the amount of a management charge is the square footage for the average single family residential parcel. One EHA base unit is 2,125 sq. ft. The pervious and impervious areas of residential parcels with two acres or less of surface area are not measured individually. Instead, such parcels are assigned one EHA unit and charged a flat rate established by resolution of the city council, which is billed quarterly. For all other parcels, the management charge is based on the actual measurements of the pervious and impervious areas of each individual parcel. The number of EHA units for these latter parcels is calculated by multiplying a parcel's impervious area in square feet by a runoff factor[2] of 0.95 and the pervious area in square feet by a runoff factor of 0.15, adding these two areas and then dividing that total by 2,125 sq. ft. The number of EHA units is then multiplied by $2.70[3] to arrive at the monthly management charge.

---

[2] The runoff factors are defined as the approximate fraction of rainfall that runs off the property to the storm drainage system.

[3] The city has reduced this figure to $2.50 since the filing of these suits. The city also has reduced the flat rate charged to the owners of residential property of two acres or less from $8 to $7.50.

The ordinance allows property owners to receive credits against the management charge for actions taken to reduce storm water runoff from their respective properties. At the time plaintiffs commenced these original actions, the ordinance allowed a residential property owner to receive a 50 percent credit against the charge by implementing city-approved "storm water best management practices" to capture and filter or store storm water. Such best practices include the creation of rain gardens or vegetated filter strips or the use of rain barrels or a cistern. The ordinance also allowed an owner of a nonresidential property to receive a credit against the service charge of between 37.5 and 75 percent for implementing best management practices designed to control storm water peak flows through the construction and use of detention or retention ponds. Schools could receive a 25 percent "education credit" for providing students with a regular and continuing program of education concentrating on the stewardship of the state's water resources. Finally, an owner of a parcel of real property that is contiguous to the Grand River could receive a credit of up to 75 percent for directly discharging storm water into the river. After the filing of these actions, and through amendments to the ordinance adopted by the city, the city increased the amount of credit allowed for certain property owners who engage in best management practices identified by the city.

Ordinance 2011.02 creates a right to an administrative appeal, but limits the scope of that appeal to "the grounds that the impervious and/or pervious area of the property is less than estimated by the Administrator or that the credit allowable to the property is greater than that estimated by the Administrator." Additionally, the ordinance authorizes the administrator of the utility to enforce payment of the management charge by discon-

tinuing water service to the property of a delinquent property owner, by instituting a civil action to collect any unpaid management charges, and by placing a lien against property for the unpaid charges and enforcing the lien "in the same manner as provided for the collection of taxes assessed upon such roll and the enforcement of the lien for the taxes."

The city began billing property owners for the management charge in May, 2011. Plaintiffs, who are property owners within the city, received invoices from the city for the management charges assessed against their respective properties, with their respective invoices for water service to their properties.

On December 16, 2011, plaintiff Jackson County commenced its instant Headlee Amendment enforcement action. Plaintiffs Jackson Coffee Company and Klein Brothers, LLC, commenced their enforcement action on December 28, 2011. Plaintiffs' claims for declaratory, injunctive, and monetary relief are predicated on the belief that the storm water management charge constitutes a disguised tax and, therefore, the imposition of the charge by the city violates § 31 of the Headlee Amendment because the city imposed the tax without a vote of the city's electorate.

II

Plaintiffs bear the burden of establishing the unconstitutionality of the city's storm water management charge. *Adair v Michigan*, 470 Mich 105, 111; 680 NW2d 386 (2004); *Kenefick v Battle Creek*, 284 Mich App 653, 655; 774 NW2d 925 (2009).

Plaintiffs' enforcement actions implicate § 31 of the Headlee Amendment, 1963 Const, art 9, § 31. An application of § 31 is triggered by the levying of a tax. *Bolt*, 459 Mich at 158-159. "Section 31 prohibits units of local

government from levying any new tax or increasing any existing tax above authorized rates without the approval of the unit's electorate." *Durant v Michigan*, 456 Mich 175, 183; 566 NW2d 272 (1997). Thus, a tax imposed without voter approval "unquestionably violates" § 31. *Bolt*, 459 Mich at 158. However, a charge that is a user fee "is not affected by the Headlee Amendment." *Id*. at 159. "There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Id*. at 160. "Generally, a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Id*. at 161 (quotation marks and citations omitted).

The seminal—and only—case addressing the distinction between a fee and a tax, in the context of storm water management, is our Supreme Court's decision in *Bolt*. In *Bolt*, the city of Lansing sought to limit the polluting of local rivers that resulted when heavy precipitation caused the city's combined storm water and sanitary sewer systems to overflow and discharge into those rivers combined storm water and untreated or partially treated sewage. *Id*. at 154-155. To this end, the city decided to separate the remaining combined storm and sanitary sewer system, at a cost of $176 million. *Id*. at 155. As a means to fund the costs of the sewer system separation,

> the Lansing City Council adopted Ordinance 925, which provides for the creation of a storm water enterprise fund "to help defray the cost of the administration, operation, maintenance, and construction of the stormwater system . . . ." The ordinance provides that costs for the storm water share of the CSO [combined sewer overflow] program (fifty percent of total CSO costs, including adminis-

tration, construction, and engineering costs) will be financed through an annual storm water service charge. This charge is imposed on each parcel of real property located in the city using a formula that attempts to roughly estimate each parcel's storm water runoff.

Estimated storm water runoff is calculated in terms of equivalent hydraulic area (EHA). As defined by the ordinance, EHA is "based upon the amount of pervious and impervious areas within the parcel multiplied by the runoff factors applicable to each." Impervious land area, which impedes water adsorption, thus increasing storm water runoff, is defined as

> [t]he surface area within a parcel that is covered by any material which retards or prevents the entry of water into the soil. Impervious land area includes, but is not limited to, surface areas covered by buildings, porches, patios, parking lots, driveways, walkways and other structures. Generally, all non-vegetative land areas shall be considered impervious.

Pervious land area is defined as "[a]ll surface area within a parcel which is not impervious[.]"

Residential parcels measuring two acres or less are not assessed charges on the basis of individual measurements, but, rather, are charged pursuant to flat rates set forth in the ordinance. These rates are based on a predetermined number of EHA units per one thousand square feet. For residential parcels over two acres, commercial parcels, and industrial parcels, the EHA for an individual parcel is calculated by multiplying the parcel's impervious area by a runoff factor of 0.95 and pervious area by a runoff factor of 0.15 and adding the two areas.

Charges not paid by the deadline are considered delinquent and subject to delayed payment charges, rebilling charges, property liens (if the charge remains unpaid for six months or more), and attorney fees if a civil suit is filed to collect delinquent charges. The ordinance further provides for a system of administrative appeals by property owners contending that their properties have been unfairly assessed. *Id.* at 155-157 (footnotes omitted).]

A taxpayer within the city of Lansing brought suit against the city on the ground that the storm water service charge constituted a tax disguised as a user fee that violated §§ 25 and 31 of the Headlee Amendment because the tax had not been submitted to or approved by a vote of the people. *Bolt*, 459 Mich at 154, 158. Our Supreme Court agreed, concluding that the storm water service charge was not a valid user fee, but, instead, was "a tax, for which approval is required by a vote of the people." *Id.* at 154. The Court reached this conclusion after considering a multiplicity of factors pertaining to the characteristics of fees and taxes, including the three primary criteria of a fee, which are: (1) a fee serves a regulatory purpose, (2) a fee is proportionate to the necessary costs of the service, and (3) a fee is voluntary. *Id.* at 161-162.

With regard to the first two criteria, the Court concluded that the storm water service charge neither served a regulatory purpose nor was proportionate to the necessary costs of the service. Rather, the Court concluded that the service charge served a revenue-raising purpose. *Id.* at 163-167. According to the Court, " 'the "fee" is not structured to simply defray the costs of a "regulatory" activity, but rather to fund a public improvement designed to provide a long-term benefit to the city and all its citizens.' " *Id.* at 164, quoting *Bolt v City of Lansing*, 221 Mich App 79, 91; 561 NW2d 423 (1997) (MARKMAN, J., dissenting). The Court reached this conclusion, in part, because,

> [i]n instituting the storm water service charge, the city of Lansing has sought to fund fifty percent of the $176 million dollar cost of implementing the CSO control program over the next thirty years. A major portion of this cost (approximately sixty-three percent) constitutes capital expenditures. This constitutes an investment in infrastructure as

opposed to a fee designed simply to defray the costs of a regulatory activity. [*Bolt*, 459 Mich at 163.]

For this same reason, the Court concluded that the " 'revenue to be derived from the charge is clearly in excess of the direct and indirect costs of actually using the storm water system over the next thirty years and, being thus disproportionate to the costs of the services provided and the benefits rendered, constitutes a tax.' " *Id.* at 164, quoting *Bolt*, 221 Mich App at 91 (MARKMAN, J., dissenting).

The Court further concluded that the storm water service charge neither served a regulatory purpose nor was proportionate to the necessary costs of the service on the basis of the following two related failings of the ordinance:

> First, the charges imposed do not correspond to the benefits conferred. Approximately seventy-five percent of the property owners in the city are already served by a separated storm and sanitary sewer system. In fact, many of them have paid for such separation through special assessments. Under the ordinance, these property owners are charged the same amount for storm water service as the twenty-five percent of the property owners who will enjoy the full benefits of the new construction. Moreover, the charge applies to all property owners, rather than only to those who actually benefit. A true "fee," however, is not designed to confer benefits to the general public, but rather to benefit the particular person on whom it is imposed. *Bray* [ *v Dep't of State*, 418 Mich 149, 162; 341 NW2d 92 (1983); *Nat'l Cable Television Ass'n v United States & Federal Communications Comm*, 415 US 336, 340-342; 94 S Ct 1146; 39 L Ed 2d 370 (1974)].

> > The distinction between a fee and a tax is one that is not always observed with nicety in judicial decisions, but according to some authorities, any payment exacted by the state or its municipal subdivisions as a contribution toward the cost of

> maintaining governmental functions, where the spe-
> cial benefits derived from their performance is
> merged in the general benefit, is a tax. [71 Am Jur 2d,
> State and Local Taxation, § 15, p 352.]

In this case, the lack of correspondence between the charges and the benefits conferred demonstrates that the city has failed to differentiate any particularized benefits to property owners from the general benefits conferred on the public.

This conclusion is buttressed by the fact that the acknowledged goal of the ordinance is to address environmental concerns regarding water quality. Improved water quality in the Grand and Red Cedar Rivers and the avoidance of federal penalties for discharge violations are goals that benefit everyone in the City, not only property owners. As stated by the Court of Appeals dissent[:]

> The extent of any particularized benefit to prop-
> erty owners is considerably outweighed by the gen-
> eral benefit to the citizenry of Lansing as a whole in
> the form of enhanced environmental quality. . . .
> When virtually every person in a community is a
> "user" of a public improvement, a municipal govern-
> ment's tactic of augmenting its budget by purporting
> to charge a "fee" for the "service" rendered should be
> seen for what it is: a subterfuge to evade constitu-
> tional limitations on its power to raise taxes. [*Bolt*,
> 221 Mich App at 96 (MARKMAN, J., dissenting).]

The second failing that supports the conclusion that the ordinance fails to satisfy the first two criteria is the lack of a significant element of regulation. See *Bray, supra* at 161-162; *Vernor* [ *v Secretary of State*, 179 Mich 157, 167-169; 146 NW 338 (1914)]. The ordinance only regulates the amount of rainfall shed from a parcel of property as surface runoff; it does not consider the presence of pollutants on each parcel that contaminate such runoff and contribute to the need for treatment before discharge into navigable waters. Additionally, the ordinance fails to distinguish between those responsible for greater and lesser levels of runoff and excludes street rights of way from the

properties covered by the ordinance. Moreover, there is no end-of-pipe treatment for the storm water runoff. Rather, the storm water is discharged into the river untreated. [*Bolt*, 459 Mich at 165-167.]

Next, the Court found that the charge lacked any element of voluntariness, which the Court found to be further evidence that the charge was a tax and not a user fee. The Court opined:

One of the distinguishing factors of a tax is that it is compulsory by law, "whereas payments of user fees are only compulsory for those who use the service, have the ability to choose how much of the service to use, and whether to use it at all." Headlee Blue Ribbon Commission [, A Report to Governor John Engler, § 5, p 29]. The charge in the present case is effectively compulsory. The property owner has no choice whether to use the service and is unable to control the extent to which the service is used. The dissent suggests that property owners can control the amount of the fee they pay by building less on their property. However, we do not find that this is a legitimate method for controlling the amount of the fee because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property. [*Bolt*, 459 Mich at 167-168 (footnote omitted).]

Finally, the Court found that the following factors also supported the conclusion that the storm water charge was a tax: (1) the revenue generated by the charge was to be used on that portion of the project that had been previously funded by general fund revenue; (2) the indebtedness generated by the levying of the charge could be secured by a lien on property; and (3) the charge was billed through the city assessor's office and may be sent with the December property tax statements. *Id.* at 168-169.

The Court closed its opinion with the following admonition:

We conclude that the storm water service charge imposed by Ordinance 925 is a tax and not a valid user fee. To conclude otherwise would permit municipalities to supplement existing revenues by redefining various government activities as "services" and enacting a myriad of "fees" for those services. To permit such a course of action would effectively abrogate the constitutional limitations on taxation and public spending imposed by the Headlee Amendment, a constitutional provision ratified by the people of this state. In fact, the imposition of mandatory "user fees" by local units of government has been characterized as one of the most frequent abridgments "of the spirit, if not the letter," of the amendment.

> The danger to the taxpayer of this burgeoning phenomenon [the imposition of mandatory user fees] is as clear as are its attractions to local units of government. The "mandatory user fee" has all the compulsory attributes of a tax, in that it must be paid by law without regard to the usage of a service, and becomes a tax lien of the property. However, it escapes the constitutional protections afforded voters for taxes. It can be increased any time, without limit. This is precisely the sort of abuse from which the Headlee Amendment was intended to protect taxpayers. [Headlee Blue Ribbon Commission Report, *supra*, § 5, pp 26-27.] [*Bolt*, 459 Mich at 169.]

In the present cases, the documents provided this Court reveal that the management charge serves a dual purpose. The charge furthers a regulatory purpose by financing a portion of the means by which the city protects local waterways, including the Grand River, from solid pollutants carried in storm and surface water runoff discharged from properties within the city, as required by state and federal regulations. The charge also serves a general revenue-raising purpose by shifting the funding of certain preexisting government activities from the city's declining general and street fund revenues to a charge-based method of revenue genera-

tion. This latter method of revenue generation raises revenue for general public purposes by augmenting the city's general and street funds in an amount equal to the revenue previously used to fund the activities once provided by the city's Engineering and Public Work Departments and now bundled together and assigned to the storm water utility. Because the ordinance and the management charge serve competing purposes, the question becomes which purpose outweighs the other. *Id.* at 165-167, 169. We conclude that the minimal regulatory purpose served by the ordinance and the related management charge is convincingly outweighed by the revenue-raising purpose of the ordinance.

Ordinance 2011.02 suffers from the same lack of a significant element of regulation as the Lansing ordinance did. Although the ordinance confers the power of regulation on the utility's administrator, the ordinance contains few provisions of regulation and no provisions that truly regulate the discharge of storm and surface water runoff, with the exception of the provision that allows for credits against the management charge for the use of city-approved storm water best management practices. Moreover, as was the case in *Bolt*, the ordinance fails to require either the city or the property owner to identify, monitor, and treat contaminated storm and surface water runoff and allows untreated storm water to be discharged into the Grand River. *Bolt*, 459 Mich at 164-167. In these regards, the city's ordinance suffers from the same regulatory weaknesses as did the Lansing ordinance struck down as unconstitutional in *Bolt*.

Further, the documents generated by and on behalf of the city and provided this Court clearly show that the desire to protect the city's general and street funds from the costs of operating and maintaining the exist-

ing storm water management system constituted the most significant motivation for adopting the ordinance and management fee. As previously noted, before the adoption of the ordinance, the city paid the costs of operating and maintaining the storm water system, including the costs of street and catch basin cleaning and leaf pickup and mulching, with revenue from the city's general and street funds. In the documents supplied this Court, the city readily admits that the costs associated with maintaining the storm water system resulted in money from these funds being directed away from "other critical programs" and that budgetary pressures, including declining general fund revenue, necessitated the tapping of new sources of funding for the maintenance of the storm water system. Similarly, the storm water utility feasibility study commissioned by the city reflects that the primary purposes of the study were to devise a method of calculating a storm water management charge of sufficient amount to fund the preexisting services the city desired to delegate to the utility and to convince the city council that the imposition of the recommended management charge would not violate *Bolt* and the Headlee Amendment. The fact that the impetus for creating the storm water utility and for imposing the charge was the need to generate new revenue to alleviate the budgetary pressures associated with the city's declining general fund and street fund revenues, and the fact that the city's activities were previously paid for by these other funds are factors that support a conclusion that the management charge has an overriding revenue-generating purpose that outweighs the minimal regulatory purpose of the charge and, therefore, that the charge is a tax, not a utility user fee. The Headlee Amendment bars municipalities from supplementing their existing revenue

streams by redefining various government activities as services and then enacting "user fees" for those services. *Id.* at 169.

Likewise, the lack of a correspondence between the charge imposed and any particularized benefit conferred by the charge supports a conclusion that the charge is a tax and not a utility user fee. A true fee confers a benefit upon the particular person on whom it is imposed, whereas a tax confers a benefit on the general public. *Id.* at 165. Although a regulatory fee may confer a benefit on both the general public and the particular individuals who pay the fee and still maintain its regulatory character, a charge is not a regulatory fee in the first instance unless it is designed to confer a particularized benefit on the property owners who must pay the fee. *Id.* at 165-166; *USA Cash #1, Inc v Saginaw*, 285 Mich App 262, 281; 776 NW2d 346 (2009). In the present cases, we cannot readily identify any particularized benefit the charge confers on the property owners that is not also conferred upon the general public. The city indicated in its original response to plaintiffs' complaints that the charge "assur[es] cleanliness and safety of the State's waters and watercourses." The city also indicated that the management charge enables the city to protect the public health and safety, to reduce the likelihood of flooding caused by excessive storm water runoff, to reduce the potential for land erosion, which can damage roads, bridges and other infrastructure and thereby endanger the public, and to prevent sewer overflows by providing a mechanism to collect and divert rain water runoff from the sanitary sewer system. We do not doubt that a well-maintained storm water management system provides such benefits. Nevertheless, these concerns addressed by the city's ordinance, like the environmental concerns addressed by Lansing's ordinance in *Bolt*,

benefit not only the property owners subject to the management charge, but also everyone in the city in roughly equal measure, as well as everyone who operates a motor vehicle on a Jackson city street or roadway or across a city bridge, everyone who uses the Grand River for recreational purposes downriver from the city, and everyone in the Grand River watershed. This lack of a correspondence between the management charge and a particularized benefit conferred to the parcels supports our conclusion that the management charge is a tax. *Bolt*, 459 Mich at 166.

Our conclusion regarding the proportionality of the charge further buttresses the conclusion that the management fee is a tax.

"Fees charged by a municipality must be reasonably proportionate to the direct and indirect costs of providing the service for which the fee is charged." *Kircher v City of Ypsilanti*, 269 Mich App 224, 231-232; 712 NW2d 738 (2005). The fact that the fee only needs to be "reasonable proportionate" suggests that mathematic precision is not necessary in calculating the fee. *Graham v Kochville Twp*, 236 Mich App 141, 154-155; 599 NW2d 793 (1999). Thus, the fee need not generate an amount equal to that required to support the services the ordinance regulates in order to survive scrutiny; however, where the revenue generated by a regulatory "fee" exceeds the cost of regulation, the "fee" is actually a tax in disguise. *Westlake Transp, Inc v Pub Serv Comm*, 255 Mich App 589, 614-615; 662 NW2d 784 (2003). This Court must presume the amount of the fee to be reasonable, " 'unless the contrary appears upon the face of the law itself, or is established by proper evidence' . . . ." *Graham*, 236 Mich App at 154-155, quoting *Vernor v Secretary of State*, 179 Mich 157, 168;

146 NW 338 (1914); see also *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665-666; 697 NW2d 180 (2005).

A permissible utility service charge is one that " 'reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component . . . .' " *Bolt*, 459 Mich at 164-165, quoting *Bolt*, 221 Mich App at 92 (MARKMAN, J., dissenting). In the present cases, the management charge is predicated on the assumption that properties contribute to runoff, and, hence, storm sewer use, as a direct function of the size of a parcel's imperious and pervious areas. Despite this assumption, residential parcels measuring two acres or less are charged a flat rate based on the average EHA of all single family parcels, and not on the individual measurements of each parcel's impervious and pervious areas. Single family residential parcels account for 12,209 or 83 percent of the 14,743 parcels within the city. According to the city, it is cost-prohibitive to calculate the EHA units for each single family residential parcel on the basis of actual measurements of impervious and pervious areas of each parcel. In contrast, residential parcels measuring over two acres and commercial, industrial and institutional parcels of all sizes are assessed a management charge based on the individual measurements of each parcel's impervious and pervious areas. This method of apportioning the management charges among all urban properties emphasizes administrative convenience and ease of measurement and, thereby, suggests an absence of a close proportional relationship between the amount of runoff attributable to a particular parcel and the management charge, as does the fact that the method of calculating the charge fails to consider property characteristics relevant to runoff generation, such as a parcel's location in reference to storm gutters and drains and soil grade.

This lack of proportionality is further demonstrated by the fact that the charge generates sufficient revenue to allow the city to maintain a working capital reserve of 25 to 30 percent of the storm water utility's total expenses. Although maintaining a capital reserve is a common practice amongst rate-based public utilities that provides a degree of fiscal stability to utilities, see 73B CJS, Public Utilities, § 64; 64 Am Jur 2d, Public Utilities, § 107, those reserves are funded by true user fees closely calibrated to the actual use of the service or a price paid for a commodity. The management charge at issue in these cases in not such a fee. For these reasons, the actual use of the storm water sewer system by each parcel is not accounted for with the requisite level of precision necessary to support a conclusion that the charge is proportionate to the costs of the services provided.

Finally, our conclusion that the city's management charge is a tax is bolstered by the fact that Ordinance 2011.02, like Lansing Ordinance 925, is effectively compulsory. Although Ordinance 2011.02 allows property owners to receive credits against the management charge for actions taken to reduce runoff from their respective properties, it does not guarantee all property owners will receive a 100 percent credit. Indeed, if the ordinance realistically allowed for all property owners to receive a 100 percent credit, the credit system would undermine the central purpose of the ordinance, which is to generate dedicated funding to maintain and operate the current storm water management system. The city would be left with a storm water sewer system to operate and maintain and no dedicated revenue source to fund street sweeping, catch-basin cleaning, and leaf pickup, among other activities necessary to the city's stewardship of the system. More importantly, however, this system of credits effectively mandates that prop-

erty owners pay the charge assessed or spend their own funds on improvements to their respective properties, as specified by the ordinance and the city, in order to receive the benefit of any credits. In other words, property owners have no means by which to escape the financial demands of the ordinance. Additionally, the ordinance authorizes the administrator of the storm water utility to discontinue water service to any property owner delinquent in the payment of the fee, as well as to engage in various civil remedies, including the imposition of a lien and the filing of a civil action, to collect payment of past-due charges. All of these circumstances demonstrate an absence of volition. This lack of volition lends further support for our conclusion that the management charge is a tax. *Bolt*, 459 Mich at 168.

III

We enter a declaratory judgment in favor of plaintiffs. The city's storm water system management charge is a tax imposed in violation of § 31 of the Headlee Amendment. The city shall cease collecting the charge and shall reimburse only plaintiffs for any charges paid to date. *Bolt v City of Lansing (On Remand)*, 238 Mich App 37, 51-60; 604 NW2d 745 (1999). Plaintiffs may tax their costs, including a reasonable attorney fee. Const 1963, art 9, § 32; *Adair v Michigan*, 486 Mich 468, 494; 785 NW2d 119 (2010).

MURPHY, C.J., and HOEKSTRA and OWENS, JJ., concurred.