*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEONARD S. BOHN, Individually and as
Representative of a Class of Similarly Situated
Persons and Entities,

UNPUBLISHED
January 29, 2019

Plaintiff-Appellant,

v

No. 339306
Wayne Circuit Court
LC No. 15-013727-CZ

CITY OF TAYLOR,

Defendant-Appellee.

Before: MURRAY, C.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Plaintiffs brought suit alleging that defendant's water and sewer rates were unreasonable and that they constituted disguised taxes in violation of the Const 1963, art 9, §§ 25-34, popularly known as the Headlee Amendment. Plaintiffs appeal the trial court's order granting defendant summary disposition under MCR 2.116(C)(10). For the reasons set forth below, we affirm.[1]

---

[1] A trial court's decision whether to grant summary disposition is reviewed de novo. *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016).

> In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ.

# I. BACKGROUND

Defendant City of Taylor (the City) operates and maintains a water and sewer system. Plaintiffs brought suit alleging numerous improprieties in the City's water and sewer ratemaking. On appeal, plaintiffs challenge only the computation of the City's sewer rates as well as the fact that the City no longer directly pays for public fire protection costs.

Specifically, plaintiffs raise two issues relating to the determination of the City's sewer rates. The parties agree that the first step of ratemaking is to determine the utility's revenue requirements. The parties also agree that, as a general matter, a utility may recover depreciation expenses through its rates. However, plaintiffs maintain through their expert, Kerry Heid, that it is improper for the City to include depreciation as an expense when it uses the cash-basis approach to determining its revenue requirements. The City admits that it is improper to include depreciation when calculating cash-basis revenue requirements. But the City, relying on its expert, Eric Rothstein, contends that the term "depreciation" was improperly used in its calculations and that the term was merely used as a "proxy" to provide funding to calculate its capital expenditures.

Plaintiffs also take issue with the accumulation of a reserve fund which will be used to fund maintenance, repairs, and improvements to the City's sewer system. Plaintiffs contend that the sewer reserve fund, which now totals over $10,000,000, shows that the City's sewer rates are in excess of the City's actual costs. Plaintiffs also maintain that it is improper for the City to use funds received from sewer rates to pay for future capital improvements to the sewer system. However, plaintiffs concede that it is appropriate for the City to maintain a reserve fund for the purposes of maintaining and repairing its sewer system, and the City argues that plaintiffs failed to establish that the amount in the City's fund is unreasonable. The City also contends that the reserve fund is properly maintained to address near-term needs and therefore does not raise concerns of "intergenerational inequity."

Lastly, plaintiffs claim that it is improper for the City to incorporate the cost of public fire protection into its service rates. Plaintiffs assert that the City should pay for those costs out of its general fund and that it is violating a City ordinance by failing to do so. Yet plaintiffs have not produced evidence that the City actually includes fire protection costs in its service rates. Further, the City contends that it is appropriate to pass the cost of public fire protection directly to consumers.

The parties filed competing motions for summary disposition. In a written opinion and order, the trial court determined that plaintiffs failed to establish a genuine issue of material fact as to whether the sewer rates constitute an unlawful tax and whether the rates were unreasonable. The trial court also determined that plaintiffs failed to establish that the City includes the cost of fire protection in its water rates.

---

[*Bank of America, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 488; 892 NW2d 467 (2016) (quotation marks and citations omitted).]

II. ANALYSIS

A. REASONABLENESS OF SEWER RATES

The City's Charter provides that the city council "shall have the power to fix from time to time such just and reasonable rates and other charges as may be deemed advisable for supplying the inhabitants of the City and others with such public services as the City may provide. . . ." Taylor Charter, § 17.3. The Charter does not provide any standards for determining "just and reasonable rates." But Taylor Ordinance, § 50-25(c), provides:

> The rates and charges hereby established shall be based upon a methodology which complies with applicable federal and state statutes and regulations. The amount of the rates and charges shall be sufficient to provide for debt service and for the expenses of operation, maintenance and replacement of the system as necessary to preserve the same in good repair and working order. The amount of the rates and charges shall be reviewed annually and revised when necessary to ensure system expenses are met and that all users pay their proportionate share of operation, maintenance and equipment replacement expenses.

It is well established that municipal utility rates are presumptively reasonable. *Trahey v Inkster*, 311 Mich App 582, 594; 876 NW2d 582 (2015). "The determination of 'reasonableness' is generally considered by courts to be a question of fact." *Novi v Detroit*, 433 Mich 414, 431; 446 NW2d 118 (1989). "[T]he presumption of reasonableness may be overcome by a proper showing of evidence." *Trahey*, 311 Mich App at 594. It is a plaintiff's burden "to show that any given rate or ratemaking practice is unreasonable." *Id*. "Absent clear evidence of illegal or improper expenses included in a municipal utility's rates, a court has no authority to disregard the presumption that the rate is reasonable." *Id*. at 595.

Under the cash-basis method of utility ratemaking, a municipality first determines "the cash needs of the utility for a given period, *i.e.*, the dollars needed to pay the expense of operation, meet debt obligations, and make such capital improvements as would not require bond financing, *e.g.*, limited new plant construction, plus recurring replacements, renovation and extensions of existing plant." *Plymouth v Detroit*, 423 Mich 106, 115; 377 NW2d 689 (1985). Plaintiffs first argue that the City improperly includes depreciation when it calculates its expenses under the cash-basis method of ratemaking. Plaintiffs' expert, Heid, reached this conclusion by relying on ratemaking manuals which provide that depreciation is not to be included when determining cash-needs revenue requirements. The City's expert, Rothstein, agrees that depreciation, which is a non-cash expense, should not count as an expense under a cash-basis ratemaking approach. But Rothstein opined that the City had simply used the label of "depreciation expense" as a proxy for properly included costs, i.e., for investment in infrastructure renewal and rehabilitation.

To begin, we note that the City is not required by law or ordinance to adhere to any ratemaking approach. Nor must the City abide by any particular ratemaking manual or guideline. Thus, we decline to hold that the City's failure to strictly follow the cash-basis approach renders its rates unreasonable or that the inclusion of depreciation in its rates is illegal

or improper. To the contrary, it is common for utilities to set rates to cover the costs of depreciation. See 64 Am Jur 2d, Public Utilities, § 125, p 516. Further, it is permissible to include a capital investment component in utility rates. See *Bolt v Lansing*, 459 Mich 152, 160, 164-165; 587 NW2d 264 (1998).

That said, we agree with plaintiffs that the City should not be allowed to accomplish a "double recovery" by counting a single expense twice in determining its revenue requirements. However, plaintiffs have not provided evidence showing that the City has engaged in such a practice. While plaintiffs note that the City has included debt service payments as a budgeted expense in its sewer rates analysis, plaintiffs have not proffered any evidence that those payments are related to the depreciated items. Indeed, Heid admitted that he did not identify any specific items in defendant's budget that were funded through debt, that he did not identify any specific instances in which defendant collected for the same amount twice, and that he could not be aware of any such instances without going through each individual item of defendant's budget.

Thus, while plaintiffs argue that the City may have obtained a double recovery by including depreciated expenses in its sewer rates, they have failed to provide any supporting evidence on that matter. By contrast, Rothstein consulted with the City officials and determined that the City did not include depreciation expense and capital expenditure projections separately but rather used depreciation expense to inform its estimate of required capital expenditures. Heid also acknowledged that it is sometimes appropriate for utilities to use depreciation as a proxy for other expenses. Although the evidence must be viewed in a light most favorable to plaintiffs, they have failed to offer specific evidence that would give rise to a factual dispute regarding the depreciated expenses. Therefore, plaintiffs have failed to present clear evidence that the inclusion of depreciation costs in the City's sewer rates was improper or that this practice renders those rates unreasonable.

Next, plaintiffs challenge what they deem to be an excessive sewer reserve fund. Taylor Ordinances, § 50-24, provides that "[a]ll funds, including surplus funds, if any, shall be kept in separate accounts for the benefit of the bondholders, the operation and maintenance of the water and sewer divisions, and for no other purpose." Heid agreed that the City should be allowed to maintain a reserve fund for maintenance and repair of the sewer system. Indeed, rate-based public utilities commonly maintain a capital reserve to provide fiscal stability. *Jackson Co v City of Jackson*, 302 Mich App 90, 111; 836 NW2d 903 (2013). Plaintiffs have not proffered any evidence as to how much money should actually be in the City's sewer fund. Heid testified that he does not know what work needs to be done to the City's sewer system and does not know how much the City needs in reserves for sewer replacements. Accordingly, plaintiffs have not shown that the amount of the City's sewer reserve fund is unreasonable per se.

Instead, plaintiffs contend that the City must have a specific plan for capital improvements equivalent to the amount in the reserve fund and that without such a plan, the fund's existence is evidence that the rates are excessive. Plaintiffs do not provide any authority (legal or otherwise) to support this contention. Setting that aside, we note that numerous witnesses testified that the City has undertaken or initiated actions and processes to assess its aging sewer system and to prepare and pursue a plan to repair and rehabilitate that system. There

was also testimony that the City's reserves are insufficient to meet its infrastructure renewal needs.

Plaintiffs counter that this a "post-hoc" justification and the City did not accumulate the reserve pursuant to any kind of capital improvement plan. For purposes of this appeal, we assume that to be true. However, we do not see how the lack of a capital improvement plan renders the accumulation of a reserve fund improper. First, there can be no plan to address the City's *unexpected* maintenance and repairs costs, which is one of the purposes of the fund. Second, Heid opined that the size of the reserve fund is largely due to the City's inclusion of depreciated expenses in its rates. Thus, the reserve fund is inherently aimed toward the replacement and renewal of the sewer system. In other words, by including depreciation expenses in its rates, the City is saving for the day when the depreciated items will need to be replaced. This does not mean, however, that the City must at all times have a plan in place for infrastructure replacements. Presumably, large improvement projects are not continuously planned and executed. Rather, such projects occur periodically as the pipes and other infrastructure decays. The evidence shows that the City is currently inspecting its system and planning infrastructure improvements, for which it will use the reserve fund. Plaintiffs fail to explain why the City must constantly have a capital improvement plan to justify the accumulation of funds that will eventually be used to fund the renewal and replacement of the sewer system.

In sum, plaintiffs fail to establish that any of the City's ratemaking practices are improper or unreasonable. Nor have plaintiffs proffered any evidence that the City's sewer rates are unreasonable. Heid admitted that he does not know what a reasonable rate is without performing a full cost of service study and that he would not be testifying concerning the amount of a reasonable rate. In general, "rate-making is a legislative function that is better left to the discretion of the governmental body authorized to set rates." *Novi*, 433 Mich at 427. "Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making." *Id*. at 430. In the absence of a complete study of the rate structure and all of its components, it is speculative to suggest that the City's sewer rates are unreasonable. Accordingly, plaintiffs have failed to demonstrate a genuine issue of material fact on that matter, and the trial court correctly granted summary disposition under MCR 2.116(C)(10).

## B. THE HEADLEE AMENDMENT

The pertinent provision of the Headlee Amendment, Const 1963, art 9, § 31, states:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

The levying of a new tax without voter approval violates this section of the Headlee Amendment. *Jackson Co*, 302 Mich App at 99. However, a charge that constitutes a user fee is not subject to the Headlee Amendment. *Id*. The plaintiff bears the burden of establishing the

unconstitutionality of the charge at issue. *Id*. at 98. A court decides, as a question of law, whether a charge is a permissible fee or an illegal tax. *Westlake Transp, Inc v Public Serv Comm*, 255 Mich App 589, 611; 662 NW2d 784 (2003).

"There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt*, 459 Mich at 160. In general, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Id*. at 161 (quotation marks and citations omitted). In *Bolt*, our Supreme Court identified three key criteria to use in distinguishing between a user fee and a tax: (1) a user fee serves a regulatory purpose rather than a revenue-raising purpose; (2) a user fee is proportionate to the necessary costs of the service; and (3) a user fee is voluntary in that property owners are able to refuse or limit their use of the service. *Id*. at 161-162. "These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665; 697 NW2d 180 (2005) (brackets, quotation marks, and citations omitted).

Water and sewer rates are generally considered user fees rather than taxes because they represent a fee paid in exchange for a service. See *Bolt*, 459 Mich at 162. Water and sewer rates are not always considered user fees, however, because they must be proportionate to the cost of the service. See *Bolt*, 338 Mich at 162 n 12. That said, as discussed above, plaintiffs have not presented evidence that the City's sewer rates themselves are unreasonable particularly in light of Heid's concession that he had not performed a rate study and that he held no opinion concerning the reasonableness of the rates. Considering that plaintiffs fail to overcome the presumption that the City's rates are reasonable, we find no basis from which to conclude that the those rates are not proportionate to the cost of service. Instead, the rates constitute a valid user fee because users pay their proportionate share of the expenses associated with the operation and maintenance of the sewer systems. See Taylor Ordinances, § 50-25(c).

Consideration of the other *Bolt* criteria does not alter the conclusion that the City's sewer rates constitute a user fee rather than a tax. The first *Bolt* factor indicates that the rates comprise a valid user fee because the rates serve a regulatory purpose of providing sewer services to the City's residents. Although the rates generate funds to pay for the operation and maintenance of the sewer system, this by itself does not establish that the rates serve a primary revenue-generating purpose. "While a fee must serve a primary regulatory purpose, it can also raise money as long as it is in support of the underlying regulatory purpose." *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999).

Plaintiffs, relying on *Bolt*, 459 Mich 152, contend that it is impermissible for the City to incorporate costs in its sewer rates which will be used to fund future capital improvements. In *Bolt*, the City of Lansing imposed a "storm water service charge" on property owners to fund the separation of the remaining portion of its combined sanitary and storm systems. *Id*. at 155. The Supreme Court determined that the storm water service charge failed to satisfy the first and second criteria because the charge did not correspond to the benefits conferred. *Id*. at 165. 75% of the property owners in Lansing were already served by a separate storm and sanitary sewer system, but those property owners would be charged the same amount as the 25% who would benefit most from the construction. *Id*. Further, the cost of this project was $176 million over 30

years. *Id*. at 155. The Court noted that the charge was "an investment in infrastructure that will substantially outlast the current 'mortgage' that the storm water charge requires property owners to amortize. At the end of thirty years, property owners will have fully paid for a tangible asset that will serve the city for many years thereafter." *Id*. at 164 (citation omitted).

*Bolt* is primarily distinguishable because it involved a rate increase to fund a completely new alteration to the existing sewer system that benefitted only 25% of the property owners. In this case, as discussed, the reserve fund is being used for maintenance and repairs of the existing system, and will be used to fund a large-scale project to replace and update much of that system which will benefit all users of the City's sewer services. Further, if one accepts the premise—as plaintiffs do—that the City may incorporate replacement costs into its rates, then we see no reason why surplus funds cannot be used to replace aging infrastructure. As for concerns that the City's ratepayers are funding improvements for future generations, we find Rothstein's reasoning on this point persuasive:

> The practical reality is that Taylor's current customers, like all utility customers, benefit from prior customers' investments that put in place a (depreciating) system to which they can connect and receive service. Equitably, current users are asked to pay to renew and replace these assets, as well as pay their share of system upgrades. Future users are asked to pay for their shares of system capacity and will likewise be responsible to pay for asserts renewals and replacements.

The users of the City's sewer system contribute to that system's wear and tear, an expense that the City recoups by including depreciation as a revenue requirement in its rate analysis. Accordingly, the users pay a fee proportionate to the necessary costs of the service. And in order for the sewer system to serve its regulatory purpose, it must be maintained and periodically replaced and updated. For those reasons, we conclude that the first two *Bolt* criteria establish that the City's sewer rates constitute a user fee rather than a tax.

As for the third *Bolt* factor, plaintiffs contend that the City's sewer services are not voluntary under statute and the City's ordinances. Even assuming that the sewer charges were deemed effectively compulsory in this case, "the lack of volition does not render a charge a tax; particularly where the other criteria indicate the challenged charge is a user fee and not a tax." *Wheeler*, 265 Mich App at 666. We are unconvinced, in the absence of showing that the sewer rates are unreasonable, that those rates should be considered a tax as opposed to a user fee. Considering the *Bolt* criteria in totality, we conclude that plaintiffs have not established that the City has imposed an unconstitutional tax.

Accordingly, plaintiffs have not demonstrated a genuine issue of material fact in support of their claims alleging violations of the Headlee Amendment and MCL 141.91.[2] Therefore, the trial court properly granted summary disposition to the City pursuant to MCR 2.116(C)(10).

---

[2] MCL 141.91 provides:

## C. FIRE PROTECTION

Plaintiffs claim that the City violated an ordinance by incorporating the costs of public fire protection into its service rates. Specifically, the water department, in addition to its primary task of providing potable water, maintains equipment and operations sufficient to assure necessary pressure for the functioning of fire hydrants. The cost paid to the water department for this service is known as "fire hydrant rental." As a general matter, the experts agreed that it is appropriate for a municipality to recover this cost through water rates. Plaintiffs argue that this practice is nevertheless improper here because it violates Taylor Ordinance, § 50-25(g), which provides in relevant part:

> The reasonable cost and value of all water and sewer service rendered to the city and its various departments by the water and sewer system, including rentals for fire hydrant service for each fire hydrant connected to the system, during all or any part of the fiscal year, shall be charged against the city and will be paid for as the service accrues for the city's current funds, including the proceeds of taxes which will be levied in an amount sufficient for that purpose.

It is undisputed that the City no longer pays $44,000 a year in rental fees for all of the fire hydrants on public property as it did until 2010. However, plaintiffs have not provided any evidence that public fire protection costs are improperly passed on to plaintiffs through the City's water rates. Tellingly, Heid testified that "there is nothing to suggest that the customers are actually paying any amount for those public fire protection services." Nor could Heid determine the amount of such a charge in the absence of a rate study. Further, Heid agreed that, at the end of the day, residents will pay for public fire protection either on their water bills or on their tax bills. Given this testimony, plaintiffs have failed to produce evidence demonstrating a genuine issue of material fact concerning whether the costs for public fire protection are improperly included in defendant's water rates or the amount of any such charge. For the same reasons, plaintiffs fail to establish that the City is receiving "free service" from the water and sewer department in contravention of MCL 141.118(1)[3] by not paying for public fire protection costs.

---

> Except as otherwise provided by law and notwithstanding any provision of its charter, a city or village shall not impose, levy or collect a tax, other than an ad valorem property tax, on any subject of taxation, unless the tax was being imposed by the city or village on January 1, 1964.

[3] MCL 141.118(1) provides:

> Except as provided in subsection (2) [which is inapplicable here], free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality. The reasonable cost and value of any service rendered to a public corporation, including the borrower, by a public improvement shall be charged against the

Affirmed.

/s/ Christopher M. Murray
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro

---

public corporation and shall be paid for as the service accrues from the public corporation's current funds or from the proceeds of taxes which the public corporation, within constitutional limitations, is hereby authorized and required to levy in an amount sufficient for that purpose, or both, and those charges, when so paid, shall be accounted for in the same manner as other revenues of the public improvement.