*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

THERESE SHAW, Individually and as
Representative of a Class of Similarly Situated
Persons,

      Plaintiff-Appellant,

and

GARISSON PLACE OFFICE CENTER LLC, and
THINK FRESH-FAIRLANE LLC,

      Plaintiffs,

v

CITY OF DEARBORN,

      Defendant-Appellee.

FOR PUBLICATION
September 19, 2019
9:05 a.m.

No.  341701
Wayne Circuit Court
LC No.  13-014215-CB

Before:  GADOLA, P.J., and BOONSTRA and SWARTZLE, JJ.

SWARTZLE, J.

Voters approved the Headlee Amendment to ensure that local taxpayers would have ultimate control over spending on local public works.  The purpose of the amendment would be thwarted if a local authority could charge higher utility rates to raise revenue and then use some of the excess funds to finance a public-works project.  This is what plaintiff Therese Shaw argues happened when the city of Dearborn sought to modernize its sewer system.  The record, however, belies plaintiff's argument—instead, the city performed ancillary repair and replacement utility work at the same time as its more extensive modernization work to save time and money, surely a worthwhile goal for any local authority.  Finding no other basis for reversal, we affirm summary disposition in favor of the city.

-1-

## I. BACKGROUND

### A. THE CITY'S WATER AND SEWER PROJECTS

Like many suburban-Detroit communities, the city of Dearborn has historically purchased water on a wholesale basis from the Detroit Water and Sewerage Department, and then passed on that water to its retail customers. Following the city of Detroit's bankruptcy, a new entity called the Great Lakes Water Authority was created that, as of January 2016, provides water and sewer services to suburban-wholesale customers such as Dearborn. The parties took the deposition testimony in this case before the creation of the Great Lakes Water Authority. Therefore, we will refer to the Detroit Water and Sewerage Department in this opinion, rather than the Great Lakes Water Authority, to maintain consistency with the deposition testimony. The newer entity's assumption of the other entity's role with respect to suburban communities makes no practical difference to the legal analysis of this case.

Historically, Dearborn has operated a "combined" sewer system. Raw sewage discharged from homes and businesses entered the same pipes as stormwater, i.e., rainwater and snowmelt, that flowed into those pipes through catch basins or infiltration. Once stormwater mixed with sewage, the mixture was deemed to constitute combined sewage, and it was required to be sent to the Detroit Water and Sewerage Department for treatment before it could be released back into the environment. On some occasions, a heavy rainstorm created what is known as a combined-sewage-overflow event. During such an event, the combined-sewer system became overloaded, causing the release of combined sewage into a natural waterway without treatment.

Increasingly stringent federal and state regulations obligated Dearborn to plan and implement measures to reduce combined-sewage-overflow events. In an August 2004 election, Dearborn voters approved a property-tax millage of $314.12 million to pay for federally mandated measures to abate combined-sewage-overflow events. The millage authorized the city to incur debt, including both bonds and low-interest loans from the State Revolving Fund (SRF), to use for abatement measures. The funds obtained from the increased millage rate were dedicated to service the debt.

Dearborn's initial plan was to construct 12 retention facilities that could store combined sewage, called caissons. During times of heavy rainfall or snowmelt, the city could store combined sewage in the caissons and then either treat the combined sewage before releasing it into the environment or send the combined sewage to the Detroit Water and Sewerage Department once that entity was able to handle the flow volume. Because of difficulties that arose in constructing the planned caissons, including legal battles with contractors and bonding companies in connection with construction, only 4 of the 12 planned caissons are currently operational. These four operational caissons serve only a portion of the city, and the sewer system remains a combined system in that portion of the city served by the caissons. Although the city funded the construction of the caissons through the millage, it currently pays the cost of operating and maintaining the caissons with revenue generated by sewer rates charged to the city's sewer customers. In other words, taxpayers built the four caissons, ratepayers operate and maintain them.

In areas of the city not served by the caissons, Dearborn is now undertaking a different abatement plan to address combined-sewage-overflow events. In these areas, the city is separating the sewer system, i.e., providing separate pipes for sewage and stormwater. In some areas, the system has already been separated, meaning that stormwater is no longer combined with sewage, and stormwater can therefore be released untreated into natural waterways, while the sewage flows to the treatment facility in a dedicated pipe. For those remaining areas where the system has not been separated, the city is either installing a new pipe for stormwater and using the existing one for sewage or vice versa.

Also, coincident with the construction project required to separate the sewer system, Dearborn has chosen to repair and replace some existing underground infrastructure. This includes replacing old or deteriorated water and sewer lines with new lines in certain areas, even when this work is not required by the sewer-separation project itself. Dearborn has scheduled this ancillary work to save time and money, given that the city was already excavating the streets under which the water and sewer lines are located, to construct the sewer-separation project. On some occasions, the city is replacing water and sewer lines because the street has already been torn up; on other occasions, the city is replacing water and sewer lines because the sewer-separation project creates a risk of damaging the infrastructure already in place.

Although the city estimated the original cost of the abatement project at $314 million when the voters approved the original property-tax millage, the cost of the entire project as designed, including both the sewer-separation work and the ancillary work, is now expected to exceed $400 million. Dearborn is paying most of this cost with the bonds and low-interest loans authorized as part of the millage, but the city is paying the costs of the ancillary work through various revenue streams, including water and sewer rates, street funds, grants, and interest earnings. To pay for the ancillary work, Dearborn is using $63 million from the sewer fund (i.e., money generated by sewer rates) and $21 million from the water fund (i.e., money generated by water rates), as a component of the anticipated $400 million overall cost of the project. The water fund is used to make repairs related to the water-supply system and the sewer fund is used to make repairs related to the sewer system. Dearborn has yet to spend about $57 million of the amount authorized by the original millage. The city anticipates that the overall project will be completed by 2022.

During discovery, several witnesses, including the city's finance director, James O'Connor, and the city's engineer, Mohmedyunus Patel, testified regarding the city's decision to perform the ancillary work on the water and sewer lines at the same time that it performed the sewer-separation work. O'Connor explained that the city chose to complete the ancillary work at the same time as the sewer-separation work because the impacted roads were already being excavated as part of the sewer-separation work, and performing the two projects simultaneously was a cost-effective measure because the roads did not have to be excavated twice. Meanwhile, Patel testified that the city paid for some of the ancillary work with millage funds because it was sometimes necessary to disturb the water lines to service the underlying sewer lines that required separation. Yet, because the sewer-separation work and the ancillary work occurred at the same time, witnesses sometimes referred to both the mandatory sewer-separation work and the ancillary work as part of a single construction project, known as the combined-sewage-overflow (CSO) project. Although the terminology used by the witnesses was sometimes imprecise, the

-3-

testimony made clear in context that the city performed the two different types of work simultaneously for reasons of efficiency and cost savings.

## B. PLAINTIFF'S LAWSUIT

Because the other plaintiffs in this case were dismissed by stipulation of the parties and are not part of this appeal, we refer to Therese Shaw as "plaintiff." Plaintiff filed this lawsuit against Dearborn in 2013 and subsequently filed an amended complaint in 2014. In her amended complaint, plaintiff alleged that the city's water and sewer rates contained hidden charges that qualified as unlawful taxes because they were imposed without authorization by Dearborn's voters, in violation of Const 1963, art 9, §§ 25-34, popularly known as the Headlee Amendment. See *Taxpayers Allied for Constitutional Taxation v Wayne Co*, 450 Mich 119, 121 n 2; 537 NW2d 596 (1995). In addition, plaintiff argued that Dearborn's water and sewer rates unjustly enriched the city. Plaintiff sought to pursue this matter as a class action and requested a refund, on behalf of herself and the purported class, of all amounts to which she alleged entitlement.

Specifically, as relevant to this appeal, plaintiff argued that the water and sewer rates that Dearborn charged the users of its water and sewer systems unlawfully included the capital infrastructure costs of separating its sewer system, and plaintiff called this purported charge the "CSO-capital charge." In addition, although plaintiff conceded that Dearborn did not use funds from its water and sewer rates to construct the combined-sewage caissons, she argued that those rates unlawfully funded the operation and maintenance of the caissons, and plaintiff called this the "CSO-O&M charge." As discussed in more detail later, it is important to note at the outset that these "charges" are terms created by plaintiff rather than terms used by Dearborn in calculating or levying its water and sewer rates. We use the terms solely for the sake of simplicity in addressing plaintiff's arguments; this is not meant to express agreement with plaintiff's assertion that these purported charges actually exist as stand-alone charges or components of the actual rates charged.

Dearborn moved for summary disposition under MCR 2.116(C)(8) and (10). The city argued that: (1) plaintiff's complaint contained no factual allegations regarding how the city's actual costs of providing water and sewer services are or should be determined; (2) the city's water and sewer rates were not a tax, but instead represented the price paid for a commodity; (3) plaintiff presented no basis to overcome the presumption that the city's water and sewer rates were reasonable; (4) the city did not create a new utility fee to pay for the construction and operation of a new stormwater-utility system, but merely modified and reconfigured an existing sewer system, and the voter-approved millage funded the cost of separating the sewer system; (5) the city's replacement of aging or compromised water mains constituted merely repair and maintenance of the existing system to avoid disruption of service; and (6) the city's water and sewer rates were compulsory only for those customers who used the services and chose how much of the services to use, and those customers were directly benefited by the city's efforts to keep the water and sewer systems in good working order and in compliance with regulatory requirements.

Plaintiff filed her own motion for summary disposition, limited to her Headlee-Amendment claim. Plaintiff argued that what she calls the CSO-capital charge qualified as a disguised tax because it financed an investment in public infrastructure and was not a fee

designed merely to defray the costs of a regulatory activity. Plaintiff also argued that what she calls the CSO-O&M charge qualified as a disguised tax because it forced all water and sewer ratepayers to pay the costs of operating and maintaining the caissons, even though the caissons served ratepayers in only certain parts of the city, and even though the caissons benefitted the general public in the form of better environmental conditions, rather than serving only ratepayers. Plaintiff argued that the two purported charges were designed to raise revenue for the city rather than serve a regulatory purpose; the charges were disproportionate to the city's actual costs of providing water and sewer service; and payment of the charges was not voluntary because the charges were hidden in water and sewer rates and not approved by Dearborn voters. Based on this, plaintiff argued that the purported charges qualified as disguised taxes that violate the Headlee Amendment.

The trial court held multiple hearings between 2014 and 2017 on the parties' motions for summary disposition. It appears from the record that the delay in resolving the dispositive motions was due to various attempts to resolve the case, including facilitation, mediation, and settlement conferences, all of which proved unsuccessful.

In December 2017, the trial court issued a 37-page opinion and order granting Dearborn's motion for summary disposition and denying plaintiff's motion for partial summary disposition. The trial court concluded that the primary purposes of the purported charges described by plaintiff were not to raise revenue, but to maintain the city's water and sewer systems and to pay the Detroit Water and Sewerage Department for the provision of water and the disposal of sewage. The trial court held that the city's upgrade of water lines qualified as maintenance rather than an investment in infrastructure. Further, the trial court concluded that the city was engaged in a regulatory activity, rather than a revenue-raising activity, when it maintained and repaired the water lines. The trial court noted that the city imposed water and sewer charges only on users, and it concluded that the charges based on metered-water usage were reasonable and proportionate. The trial court further concluded that the burden of sewer separation was borne in large part by funds approved in the August 2004 election. For these reasons, the trial court concluded that the purported charges described by plaintiff were user fees rather than taxes and granted the city summary disposition on plaintiff's Headlee-Amendment claim. The trial court likewise dismissed plaintiff's unjust-enrichment claim, ruling that plaintiff failed to present evidence that an overcharge or tax existed.

After plaintiff filed a claim of appeal with this Court, the city moved to expand the record on appeal. The city sought to add to the record evidence of a millage election held in August 2018 in which Dearborn's voters approved $60 million of additional property taxes to pay for the sewer-separation project. This Court denied the city's motion to expand the record on appeal. *Shaw v Dearborn*, unpublished order of the Court of Appeals, entered February 22, 2019 (Docket No. 341701).

## II. ANALYSIS

### A. STANDARD OF REVIEW

Before the trial court, Dearborn moved for summary disposition under MCR 2.116(C)(8) and (10). "Where a motion for summary disposition is brought under both MCR 2.116(C)(8)

and (C)(10), but the parties and the trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008). We review de novo a trial court's decision to grant or deny summary disposition under MCR 2.116(C)(10). *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). A mere promise or possibility that a claim might be supported by evidence produced at trial is insufficient to avoid summary disposition. *Bennett v Detroit Police Chief*, 274 Mich App 307, 317; 732 NW2d 164 (2007), citing *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). Whether a charge imposed by a city is a tax or a user fee is a question of law that we review de novo. *Bolt v Lansing*, 459 Mich 152, 158; 587 NW2d 264 (1998).

## B.  HEADLEE-AMENDMENT CLAIMS

The Headlee Amendment was adopted by referendum effective December 23, 1978. *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 355; 604 NW2d 330 (2000). Under the amendment, a local governmental unit is "prohibited from levying any tax not authorized by law or charter . . . or from increasing the rate of an existing tax above that rate authorized by law or charter" when the amendment was ratified, unless a majority of voters have approved the levying of a new tax or increasing the rate of an existing one. Const 1963, art 9, § 31. In ratifying the amendment, it was clear that voters " 'were . . . concerned with ensuring control of local funding and taxation by the people most affected, the local taxpayers. The Headlee Amendment is the voters' effort to link funding, taxes, and control.' " *Macomb Co Taxpayers Ass'n v L'Anse Creuse Pub Sch*, 455 Mich 1, 7; 564 NW2d 457 (1997), quoting *Durant v State Bd of Ed*, 424 Mich 364, 383; 381 NW2d 662 (1985). "The ultimate purpose [of the Headlee Amendment] was to place public spending under direct popular control." *Waterford Sch Dist v State Bd of Ed*, 98 Mich App 658, 663; 296 NW2d 328 (1980). The amendment "grew out of the spirit of 'tax revolt' and was designed to place specific limitations on state and local revenues." *Id*.

Application of § 31 of the Headlee Amendment "is triggered by the levying of a tax." *Jackson Co v City of Jackson*, 302 Mich App 90, 98; 836 NW2d 903 (2013), citing *Bolt*, 459 Mich at 158-159. Although the levying of a new tax without voter approval violates the Headlee Amendment, a charge that constitutes a user fee does not. *Id*. In a case alleging a violation of the Headlee Amendment, the plaintiff bears the burden of establishing the unconstitutionality of the charge at issue. *Id*. at 98.

As explained by our Supreme Court, "There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt*, 459 Mich at 160. In general, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Id*. at 161 (cleaned up). Under *Bolt*, courts apply three key criteria when distinguishing between a user fee and a tax: (1) "a user fee must serve a regulatory purpose rather than a revenue-raising purpose"; (2) "user fees must be proportionate to the necessary costs of the service"; and (3) a user fee is voluntary in that users are "able to refuse or limit their use of the commodity or service." *Id*. at 161-162. "These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665; 697 NW2d 180 (2005) (cleaned up).

## C. MUNICIPAL WATER AND SEWER RATES

Because the purported charges that plaintiff challenges are, according to plaintiff, embedded in the city's water and sewer rates, it is appropriate to summarize legal principles that govern judicial review of municipal-utility rates. Courts typically afford great deference to municipal-ratemaking authorities. See *Novi v Detroit*, 433 Mich 414, 425-426; 446 NW2d 118 (1989). "Michigan courts have long recognized the principle that municipal utility rates are presumptively reasonable." *Trahey v Inkster*, 311 Mich App 582, 594; 876 NW2d 582 (2015). A fee charged by a municipality is "presumed reasonable unless it is facially or evidently so wholly out of proportion to the expense involved that it must be held to be a mere guise or subterfuge to obtain the increased revenue." *Kircher v Ypsilanti*, 269 Mich App 224, 232; 712 NW2d 738 (2005) (cleaned up). This is because "rate-making is a legislative function that is better left to the discretion of the governmental body authorized to set rates." *Novi,* 433 Mich at 427. "Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making." *Id*. at 430. "Absent *clear evidence* of illegal or improper expenses included in a municipal utility's rates, a court has no authority to disregard the presumption that the rate is reasonable." *Trahey*, 311 Mich App at 595 (emphasis added).

Plaintiff argues generally that defendant's focus on the reasonableness of its rates is a "canard" and that whether a municipal-utility rate is reasonable is a separate issue from whether the rate qualifies as an unlawful tax. Contrary to plaintiff's argument, the presumption that the amount of a municipal fee is reasonable is pertinent here and has been noted by this Court when reviewing the second *Bolt* factor regarding the proportionality of a charge imposed by a city. See *Jackson Co*, 302 Mich App at 109. Yet, this presumption is just that—a presumption—and it can be overcome by the plaintiff with a showing of sufficient evidence to the contrary. *Trahey*, 311 Mich App at 594.

## D. PURPORTED "HIDDEN" CHARGES

Initially, it is important to emphasize that Dearborn does not impose a distinct charge or fee called a CSO-capital charge or a CSO-O&M charge. These are merely terms created by plaintiff for the purpose of this litigation. Plaintiff claims that these purported charges are embedded in the city's water and sewer rates, but cites no pertinent authority suggesting that it is appropriate for the purpose of a Headlee-Amendment claim to analyze a purported charge that is not separately or distinctly assessed by the governmental agency. Cf. *Bolt*, 459 Mich at 154 (addressing a *distinct* charge known as a "storm water service charge" imposed); *Jackson Co*, 302 Mich App at 93 (addressing a *distinct* charge called a "storm water management charge" imposed by city ordinance). With that said, we recognize that a municipality cannot avoid the Headlee Amendment simply with bookkeeping maneuvers, and therefore we address the merits of plaintiff's claim.

## E. NO GENUINE ISSUE OF MATERIAL FACT ON PLAINTIFF'S CLAIMS

Plaintiff first argues that so-called CSO-capital charges and CSO-O&M charges purportedly embedded in the city's water and sewer rates violate the Headlee Amendment and that the trial court improperly made factual findings that prevented it from reaching the legal

issues regarding plaintiff's Headlee-Amendment claim. Specifically, plaintiff argues that a genuine issue of material fact exists regarding whether the city paid for the separation of the sewer and storm systems with funds obtained from water and sewer rates. Plaintiff argues that the trial court made an erroneous factual finding that the city paid the costs of the sewer-separation project with tax revenues from the 2004 millage election, rather than paying for that project with funds obtained from utility rates. Our review of the record confirms that the trial court made no erroneous factual findings. The trial court instead reviewed the evidence submitted by the parties and correctly concluded that plaintiff failed to demonstrate a genuine issue of material fact in support of her Headlee-Amendment claim.

## 1. CSO-CAPITAL CHARGE

Plaintiff defines the CSO-capital charge as the imposition on water and sewer ratepayers of some of the infrastructure costs of the city's sewer-separation project. Significantly, the city conceded in its brief on appeal that it told the voters that it *would* increase utility rates to pay for the sewer-separation project if the voters did not approve the proposed millage in 2004. Therefore, it is not unwarranted for system users to believe that the city might decide to spend funds obtained from rates to pay for some portion of the sewer-separation project. Yet, providing evidence of what the city proposed, planned, or budgeted is not the same as providing proof of what the city actually did.

In her brief on appeal, plaintiff argues that the city "plans to spend" certain amounts from the sewer and water funds to complete the sewer-separation project. Plaintiff cites no authority that a Headlee-Amendment claim may be predicated on a mere *plan* to spend certain funds in the absence of an actual expenditure. In the case of an individual plaintiff, a cause of action for a tax refund accrues when the tax is due. See *Taxpayers Allied*, 450 Mich at 124. Plaintiff has not established that a mere budget plan alone is a sufficient basis for asserting a claim under the Headlee Amendment, in the absence of any evidence that the city effectuated the budget plan in reality. To the extent that plaintiff is relying on the city's alleged plan to spend money from the water and sewer funds in the future, plaintiff's claim is not ripe because it rests on speculation about possible future events. "The doctrine of ripeness is designed to prevent the adjudication of hypothetical or contingent claims before an actual injury has been sustained. A claim that rests on contingent future events is not ripe." *King v Mich State Police Dep't*, 303 Mich App 162, 188; 841 NW2d 914 (2013) (cleaned up).

As explained earlier, the plaintiff bears the burden of establishing that a charge violates the Headlee Amendment. *Jackson Co*, 302 Mich App at 98. Plaintiff argues that a genuine issue of material fact exists regarding whether the city paid for the sewer-separation project with funds obtained from water and sewer rates. Yet, after ample time and significant discovery, plaintiff has presented no evidence that the city actually charged the costs of the sewer-separation work to its ratepayers after the city's voters approved the millage. Instead, the record indicates that the city charged its ratepayers for the ancillary water and sewer work that was performed at the same time as the sewer-separation work. As multiple witnesses testified, Dearborn performed ancillary projects to repair or replace old or deteriorated water mains and sewer mains even though such work was not necessitated by the sewer-separation project itself. The city scheduled this ancillary work contemporaneously with the sewer-separation project to save ratepayers the cost of having to tear up the road a second time. Although witnesses sometimes referred to the

ancillary work as part of the same construction project, that work served a different purpose than the sewer-separation work itself.

Plaintiff points to a portion of the city's 2013 financial statement that states, in relevant part, that the city "uses resources from the Major Street & Trunkline Fund, Local Street Fund, Water Fund, and Sewer Fund to partially fund the separation projects." This is a generalized statement that fails to establish the existence of any actual expenditure of funds from water or sewer rates on the sewer-separation project itself, as opposed to the ancillary projects. This is especially true given that the financial statement uses the plural term "projects" and the paragraph as a whole refers to several related projects.

Plaintiff also points to deposition testimony from various city officials. In this regard, we observe that plaintiff has selectively quoted deposition testimony out of context. As one example, plaintiff's reply brief on appeal quotes the following excerpt of O'Connor's deposition testimony, with the bracketed material below inserted by plaintiff:

*Q.* All right. We would agree that the cost of that [the sewer separation project] is being financed through monies that the City receives through water and sewer rates that are imposed, correct?

*A.* Yes.

*Q.* And so somebody who owns a house in the City of Dearborn who has access to the water and sewer system is paying some portion of the City's cost of the sewer separation project, correct? Right?

*A.* Yes.

Read in its full context, however, O'Connor's deposition testimony refers not merely to the sewer-separation project but to the entirety of the work being performed, including the ancillary work that the city performed contemporaneously with the sewer-separation project. Here is a more complete excerpt of O'Connor's deposition testimony on this point, including questions and answers that plaintiff omitted from the appellate briefing:

*Q.* All right. Well, I'll part [sic] my question out. Water lines are part of—new water lines are part of the sewer separation fund, correct?

*A.* They're being done at the same time.

*Q.* All right. But it's being told to the citizens that it's one of the benefits of the sewer separation project, right?

*A.* Yes.

*Q.* New water lines. Okay. And there's [new] sewer—and there's replacement sewer lines, and there's [new] storm sewers, correct?

*A.* Yes.

*Q.* All right. We would agree that the cost of that is being financed through monies that the City receives through water and sewer users via the rates that are imposed, correct?

*A.* Yes.

*Q.* And so somebody who owns a house in the City of Dearborn who has access to the water and sewer system is paying some portion of the City's cost of the sewer separation project, correct? Right?

*A.* Yes.

Later in his deposition, O'Connor explained how he viewed the water-line-replacement project, stating that it was included by the city's choice as part of the overall sewer-separation project—in the sense that it was being performed at the same time—but that the ancillary work was not mandatory like the sewer-separation work itself:

*THE WITNESS*: I don't believe any of the water lines has been mandated to be replaced. That was a decision made that since the road is going to be ripped up and sewer lines are going to be replaced, that with the convenience of that, that water lines would be replaced at the same time.

*Q.* I don't care whether it's mandated or not. That's not part of my question.

*A.* Okay.

*Q.* My question is, is it part of the project?

*A.* By choice, yes.

*Q.* All right.

*A.* So these water lines are old. The City's system is very old and the roads are ripped up, and it's a great time to replace the water lines at the same time.

O'Connor testified further on this point when questioned by Dearborn's attorney:

*Q.* And the CSO project—and I think we've already covered this, but I just want to clarify—that includes non—even though we call it a combined sewer overflow project, there are actually other nonsewer-related improvement components to that project?

\* \* \*

*A.* Yes.

-10-

*Q.* And part of that is replacing City water lines; is that correct?

*A.* Yes.

*Q.* And is it more cost-effective to replace the City water lines that are part of the CSO project in conjunction with the CSO project, as opposed to going back and tearing up the roads at some other date?

*A.* Yes.

*Q.* Is that why you're planning on replacing the water lines in conjunction with the CSO project?

*A.* Yes. And it's not me, it's the City.

Having reviewed the relevant portions of O'Connor's testimony in context, we are not convinced by plaintiff's suggestion that O'Connor admitted that funds from water and sewer rates were used to pay for the sewer-separation project. Plaintiff has pulled from context part of O'Connor's testimony and omitted testimony indicating that O'Connor was referring to the ancillary work, rather than the sewer-separation work itself, when discussing the use of funds obtained from water and sewer rates.

Plaintiff also argues that the city's brief on appeal has for the first time divided the sewer-separation project into three aspects, i.e., sewer-separation work, water-line work, and sewer-line work. Having reviewed the relevant deposition testimony, we do not share plaintiff's view that the city's appellate brief created for the first time a new nomenclature to describe the sewer-separation project. In truth, the city's description of the work in its appellate briefing is fully consistent with how witnesses described the work in deposition testimony. The testimony supports the city's explanation that, at the same time that it was performing the federally mandated sewer-separation work, the city voluntarily chose to repair or replace infrastructure that was not part of the sewer-separation work itself, for the sake of efficiency in avoiding the costs of having to tear up the road a second time. This is not by any means a new explanation created by the city on appeal, as plaintiff incorrectly suggests.

For its part, the city argues on appeal that the state of Michigan "policed" the city's expenditures to ensure that funds were properly spent. The city points to the fact that the SRF reimburses the city for eligible project expenses, and argues that the SRF ensured that the tax dollars raised in the 2004 millage were spent only on sewer-separation work. It does not follow, however, that the SRF reviewed the city's expenditures on all of the various construction projects in which it was engaged for compliance with the Headlee Amendment. First, although the SRF reviewed expenditures submitted to it by the city for reimbursement, the city could avoid the SRF's review by simply not submitting proof of an expenditure for reimbursement. Second, the SRF reviewed whether the submitted expenses related to sewer-separation work performed by the city. The fact that the city spent tax funds on the sewer-separation project, as verified by the SRF, does not necessarily mean that the city did not also spend water- and sewer-rate funds on the sewer-separation project, without oversight from the SRF. Therefore, the city's reliance on the SRF's involvement in the sewer-separation project is unconvincing.

-11-

Nonetheless, the record confirms that the sewer-separation project was funded by the bonds and low-interest loans to be paid by the property taxes authorized by the August 2004 millage election. At the time of the trial court proceedings, the city had yet to spend about $57 million of the amount authorized by the 2004 millage election for the sewer-separation project. This, in itself, contradicts plaintiff's contention that the city resorted to using ratepayers' funds for the sewer-separation work because the city purportedly ran out of funds authorized by the 2004 millage election. Furthermore, although this Court denied defendant's motion to expand the record, *Shaw v City of Dearborn*, unpublished order of the Court of Appeals, entered February 22, 2019 (Docket No. 341701), we nonetheless take judicial notice of an August 2018 millage election in which defendant's voters authorized $60 million of additional property taxes to pay for the completion of the sewer-separation project. See MRE 201(b); *Gleason v Kincaid*, 323 Mich App 308, 314 n 1; 917 NW2d 685 (2018) (taking judicial notice of an election result). While not dispositive, the fact that the city recently obtained voter approval for more tax revenues to finish the sewer-separation project tends to undermine plaintiff's claim that the city is using funds from water and sewer rates to pay for the project because, according to plaintiff, the city has run out of other funds.

We acknowledge that the record is not always clear on how the city funded each aspect of the various components involved in its multi-year construction project. But it is not this Court's role to audit each and every aspect of the city's expenditures. It is plaintiff who is asserting a violation of the Headlee Amendment, and after extensive discovery, she simply has not presented evidence establishing that any funds obtained from water and sewer rates were used to pay for the mandatory sewer-separation project itself.

2. CSO-O&M CHARGE

Plaintiff also argues that the city's water and sewer rates include the CSO-O&M charge, which, as defined by plaintiff, is the cost of operating and maintaining the caissons constructed to hold sewage during combined-sewage-overflow events and then either treat the sewage or send it to another facility for treatment. Plaintiff concedes that the city paid for the construction of the caissons with the proceeds of the voter-approved millage. Thus, plaintiff admits that the purportedly hidden charges in her utility rates "do not technically finance" an investment in infrastructure, when it comes to the caissons.

Nonetheless, plaintiff still posits that there are embedded taxes within her utility rates, arguing that a charge need not pay for infrastructure to qualify as a disguised tax. First, plaintiff suggests that the city uses the caissons for stormwater rather than sewage. This is incorrect given that stormwater that has not mixed with sewage need not be held or treated and can instead be discharged untreated into natural waterways. It is only when stormwater has mixed with sewage in the combined part of the sewer system that the city uses the caissons, as treatment of the combined sewage is required.

Second, plaintiff claims that not all sewer ratepayers benefit from the caissons because the caissons are used for sewage discharged by only some users of the city-wide system. Plaintiff's argument ignores the reality of a sewer system that is comprised of multiple pipes and facilities. One need not be a hydraulic engineer to understand that the sewage discharged by any particular ratepayer does not pass through every piece of infrastructure in a city-wide sewage-

disposal system. From its point of entry into the sewer system, the sewage flows downhill, unless it reaches a low point and is pumped to a higher elevation through use of a lift station, and then it flows downhill again, through the shortest route possible to reach the holding or treatment facility. Plaintiff has cited no authority establishing that a city must individualize each user's sewer rate based on which specific pipes and facilities transport, hold, or treat the sewage discharged by that particular ratepayer.

Under the analysis suggested by plaintiff, a city could never use funds obtained from city-wide water or sewer ratepayers to install, repair, or replace any particular pipe or facility that is part of the overall water or sewer system. Take, for example, a water main that runs beneath a major thoroughfare on the west side of any average city. The water main does not transport water to the residential homes, commercial businesses, or industrial factories on the east side of that city. Yet, when the water main ruptures and must be repaired, the city can use funds obtained from the general pool of water ratepayers to make the repairs—without transforming its water rates into an unconstitutional tax. The city is not constrained by the Headlee Amendment to determine which specific homes, businesses, or factories in the city use water that flows through the specific water main that burst, and then use revenues derived from only those users to pay the cost of repairing that burst pipe. When the city uses funds paid by water ratepayers throughout the entire city to pay for the repairs to the burst water main, that repair does not transform the city's water rates into an illegal tax on the ratepayers who use water that flows through pipes other than the one that burst. Rather, the water rates are used to operate and maintain a viable water-supply system for the entire city and the revenues used to make the repairs serve a regulatory purpose of providing water to all of the city's residents.

An analysis of the *Bolt* factors confirms that defendant did not violate the Headlee Amendment with respect to the purported CSO-O&M charges. As discussed earlier, the record evidence does not support plaintiff's claim that a capital charge for sewer separation is embedded in defendant's rates. Given the absence of evidence that such a charge exists in defendant's water and sewer rates, it is impossible to apply the *Bolt* factors to this nonexistent charge. With respect to the CSO-O&M charges, however, it is undisputed that a portion of the city's utility rates is used to fund operation and maintenance of the caissons, and therefore we can consider those charges under the *Bolt* factors. In so doing, we follow our Supreme Court's holding in *Bolt* that water and sewer charges are not always user fees and that such charges must be measured against the "relevant criteria for whether a charge is a fee or a tax." *Bolt*, 459 Mich at 162-163, n 12.

Under the first *Bolt* factor, it is beyond dispute that the city's water and sewer rates comprise a valid user fee because the rates serve the regulatory purpose of providing water and sewer service to the city's residents. Although the rates generate funds to pay for the operation and maintenance of the water and sewer systems in their entirety, this by itself does not establish that the rates serve primarily a revenue-generating purpose. "While a fee must serve a primary regulatory purpose, it can also raise money as long as it is in support of the underlying regulatory purpose." *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999). Further, the alleged CSO-O&M charge, i.e., the cost of operating and maintaining the caissons, is part of the cost of providing sewer service to the city's ratepayers. Dearborn must provide sewer service in conformance with state and federal regulatory requirements, and keeping the caissons functional helps ensure that sewage is properly treated before it is released into the environment.

-13-

Therefore, unlike the facts in *Bolt* and *Jackson Co*, in which storm water was released into the environment untreated, *Bolt*, 459 Mich at 167; *Jackson Co*, 302 Mich App at 106, the alleged costs at issue here are related to the treatment of combined sewage comprised of stormwater and waste water, in conformance with regulatory requirements. Therefore, a significant regulatory component exists here that was absent in *Bolt* and *Jackson Co*.

Under the second *Bolt* factor, the water and sewer rates constitute a valid user fee because users pay their proportionate share of the expenses associated with the operation and maintenance of the water and sewer systems. Mathematic precision is not required when reviewing the reasonable proportionality of a utility fee. See *Trahey*, 311 Mich App at 597, citing *Jackson Co*, 302 Mich App at 109. "Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax." *Bolt*, 459 Mich at 164-165 (cleaned up). It is uncontested that Dearborn determines its water and sewer rates based on metered-water usage. Plaintiff has presented no evidence (e.g., expert testimony) to establish that metered-water usage is an insufficiently precise measurement of the actual costs of using the city's water and sewer systems or otherwise to show that the water and sewer charges are disproportionate to the overall cost of those services. Furthermore, plaintiff has provided no analysis taking into account the benefits conferred by the city's services or the savings realized by the city's performance of ancillary water-main and sewer-line work simultaneously with the sewer-separation project to avoid having to tear apart the roads a second time.

Instead, plaintiff argues that the city's application of metered-water usage as a method of establishing water and sewer rates necessarily qualifies those water and sewer rates as an unconstitutional tax. Plaintiff reasons that the amount of water that a ratepayer withdraws from the tap bears no relation to the amount of stormwater that enters the combined-sewer system, and she argues that funds derived from water ratepayers therefore cannot be used to pay for the construction, operation, or maintenance of anything related to stormwater without transforming the water and sewer rates into an unconstitutional tax. Plaintiff further argues that the city should design a system of charging property owners, rather than ratepayers, for the removal of stormwater that flows across their property before entering the combined-sewer system or the separated-storm system. Yet, under the Headlee Amendment, it is not this Court's role to determine whether a municipal government has chosen the best, wisest, most efficient, or most fair system for funding a municipal improvement or service. This Court's role, rather, is to determine whether a particular charge imposed by a municipal government is a true user fee or a disguised tax. In so doing, we reject plaintiff's argument that application of metered-water usage as a method of establishing water and sewer rates necessarily qualifies those rates as an unconstitutional tax. Instead, plaintiff must offer evidence to support her position, and on this score, she has failed.

Also, the facts of this case, in which water and sewer rates are determined on the basis of metered-water usage, is distinct from the facts of *Bolt* and *Jackson Co*, in which the local units of government used flat rates to determine the amount of a storm-water fee for residential parcels of two acres or less. See *Bolt*, 459 Mich at 156 n 6; *Jackson Co*, 302 Mich App at 96. For these reasons, plaintiff has failed to overcome the presumption that defendant's water and sewer rates,

including the costs of operating and maintaining the caissons, are reasonable. See *Jackson Co*, 302 Mich App at 109. Application of the second *Bolt* factor overall thus indicates that the city's water and sewer rates comprise a valid user fee because users pay their proportionate share of the expenses required to operate and maintain the water and sewer systems.

The third *Bolt* factor also weighs in favor of finding that Dearborn's water and sewer rates constitute a valid user fee. Each individual user decides the amount and frequency of usage, i.e., each user decides how much water to draw from the tap. See *Ripperger v Grand Rapids*, 338 Mich 682, 686; 62 NW2d 585 (1954) (explaining that "[n]o one can be compelled to take water unless he chooses" and charges for water and sewer services based on water usage do not comprise taxes); *Mapleview Estates, Inc v Brown City*, 258 Mich App 412, 417; 671 NW2d 572 (2003) (holding that an increased fee for connecting new homes to water and sewer systems was voluntary because, *inter alia*, "those who occupy plaintiff's homes have the ability to choose how much water and sewer they wish to use"). The purported charges at issue in this case are voluntary because each user of the city's water and sewer system can control how much water they use.

Applying the *Bolt* factors, we conclude that defendant's water and sewer rates—including the costs of operating and maintaining the caissons—comprise a valid user fee rather than a tax. Therefore, we conclude that the trial court properly granted summary disposition to defendant regarding plaintiff's claim under the Headlee Amendment.

### 3. UNJUST-ENRICHMENT CLAIM

Finally, plaintiff argues that the trial court erroneously granted summary disposition to the city on her claim that Dearborn has been unjustly enriched by collecting the purported water and sewer charges at issue. Yet, as explained, plaintiff presented no evidence that the purported CSO-capital charge is included in defendant's water and sewer rates, that there is anything improper about what she calls the CSO-O&M charge, or that defendant's water and sewer rates are unreasonable. Plaintiff has thereby failed to establish any inequity based on the water and sewer rates. *AFT Mich v Michigan*, 303 Mich App 651, 677-678; 846 NW2d 583 (2014), aff'd 497 Mich 197 (2015). The trial court properly granted summary disposition to the city on this claim.

In light of our analysis, it is unnecessary to address the city's alternative argument that the Revenue Bond Act of 1933, MCL 141.101 *et seq.*, authorized the imposition of water and sewer rates before the Headlee Amendment was ratified.

### III. CONCLUSION

The city of Dearborn received voter approval to raise revenues for a major modernization of its sewer system. The city made the practical decision to repair and replace certain water and sewer infrastructure at the same time to save time and money, and this was to the benefit of ratepayers, rather than to their detriment, notwithstanding plaintiff's arguments to the contrary.

Accordingly, for the reasons set forth in this opinion, we affirm the trial court's grant of summary disposition to defendant. Having prevailed in full, defendant may tax costs under MCR 7.219.


/s/ Brock A. Swartzle
/s/ Michael F. Gadola
/s/ Mark T. Boonstra